OPINION OF THE COURT
Arthur D. Spatt, J.
This court must decide whether, under the facts here presented and the law of our State, life sustaining treatment for a 41-year-old man can be terminated.
BACKGROUND
By order to show cause signed October 15, 1982, at 5:30 p.m., petitioner Lydia E. Hall Hospital (herein referred to as the Hospital) sought an order of this court authorizing the Hospital to continue hemodialysis treatment of their patient Peter Cinque. The order to show cause was directed to Mark Cinque, Mary Biondo and Joseph Cinque as next of kin of patient Peter Cinque;
The petition annexed to the order to show cause recites that Peter Cinque is suffering from end stage renal disease, diabetes mellitus, blindness and bilateral amputations due to gangrene “and may unless hemodialysis is administered to him in connection with the treatment for said disease suffer loss of life.”
*478 The court conducted an informal hearing in chambers at the time of the issuance of the order to show cause. After hearing Dr. Norma Wenger and Mark Cinque, the court orally directed the Hospital to continue the dialysis treatment, and set the matter down for a plenary hearing at the Hospital on Monday, October 18, 1982, at 10:00 a.m. In addition, Dr. Wenger expressed no objection to the discharge of the patient from the Hospital.
Later that same evening, having received additional information from the Hospital, and upon further reflection, the court telephonically directed the Hospital not to discharge the patient and issued a short form order directing the Hospital to continue routine dialysis treatment; not to discharge or release the patient; and for all parties to appear and take part in the continued hearing at the. Hospital on Monday, October 18, 1982, at 10:00 a.m.
Prior to and at the hearing on October 18,1982, the court was advised that Peter Cinque, who had been previously alert, oriented and competent, had developed respiratory arrest and was in a coma. After having personally observed the patient’s comatose condition, and after hearing competent medical proof confirming that fact, sua sponte and on the application of the patient’s next of kin, the court appointed Thomas W. Stanisci, Esq., as guardian ad litem to protect the rights and interests of Peter Cinque. Counselor Stanisci came to the Hospital and thereafter participated in the October 18 hearing.
In order to permit the guardian to review the records and the evidence, and to afford the court another opportunity to attempt to communicate directly with Peter Cinque, the hearings were recessed to October 21, 1982, at which time they were concluded. At the October 21 hearing, the guardian and the Cinque family orally applied for an order removing all other life preserving extraordinary means of treatment.
FINDINGS OF FACT
Peter Cinque, an unmarried man 41 years of age, has no dependents. He is, however, blessed with a loving family of a mother, six brothers and a sister. Peter was afflicted with juvenile diabetes mellitus at age five. Diabetes mellitus is *479 a metabolic disorder in which the ability to oxidize carbohydrates is more or less lost, usually resulting from faulty pancreatic activity with consequent disturbance of the normal insulin mechanism. This condition produces hyperglycemia (abnormal increase in the glucose level in the blood) and may result in acidosis and coma. The ravages of this insidious disease may affect other parts and functions of the body and may result in chronic complications, including neuropathy (disorder of the nervous system), retinopathy (degenerative disease of the retina), nephropathy (disease of the kidneys), and generalized changes in large and small blood vessels. (See Stedman’s Medical Dictionary [4th ed], at p 385; Borland’s Illustrated Medical Dictionary [25th ed], at p 434.)
Although life dealt him this cruel blow, Peter Cinque persevered and attained an education sufficient to become a teacher and to lead a useful life until the spreading residuals of the diabetes took their toll. He apparently continued his studies until 1979. By reason of the retinopathy, he became, within the last few yéars, totally blind.
In addition, both kidneys were affected and are inoperative. He is in end stage renal disease, and, since 1979, has required hemodialysis in order to live. Dialysis is a cleansing procedure of the blood accomplished by way of attachment to a machine. Peter must have dialysis three times a week, each procedure taking four hours to accomplish.
As a result of severe peripheral neuropathy and serious peripheral vascular disease, he has been confined to a wheelchair and recently, as a result of these diseases which emanated from his basic diabetic condition, Peter sustained bilateral amputations of both lower extremities; his left leg was amputated below the knee; his right leg was amputated above the knee. The surgical wound involving the left stump is not healing well; and if this condition persists, he will require an above-the-knee amputation of the left leg.
Other medical problems inflicted upon this gravely ill man are gastrointestinal bleeding, a bleeding ulcer and calcification of the aorta.
These medical conditions, including the recent bilateral amputations, were a competent producing cause of great *480 pain and suffering to Peter Cinque. He was blind, totally incapacitated, crippled and wracked with pain which necessitated analgesic medication including the use of Demoral.
Despite these grievous physical ailments, with few deviations, Peter remained mentally alert and competent. Although on three or four occasions he had semicomatose episodes, they were for short periods of time, and his mental condition returned to normal. These episodes were caused by chemical imbalance on a metabolic basis secondary to dialysis, and did not result in brain damage. His mental condition was oriented, adjusted and normal to October 17, 1982.
On Sunday, October 17, 1982, at approximately 5:00 a.m., Peter Cinque sustained respiratory arrest and stopped breathing. A “code” alarm was sounded and his life was saved. However, he has, since that time, been in a coma. The neurological diagnosis by Dr. Morris Dickman is severe anoxic encephalopathy, meaning a lack of oxygen in the brain. So that, superimposed on Peter’s other catastrophic illnesses, residuals and disabilities, he has sustained irreversible diffuse damage to both hemispheres of the brain at the cortical and subcortical levels.
According to Dr. Dickman, he is in a coma and could improve only to a vegetative state and will be totally unable to make a rational decision. Even if there is improvement, says Dr. Dickman, he will never have the ability to speak or think. The time for Peter Cinque to himself make a decision as to his future medical treatment has passed. The court will have to consider whether Peter made a decision not to be further treated by dialysis based on evidence of his past actions before he was rendered incompetent.
The court attempted on two separate occasions, on Monday, October 18 and Thursday, October 21, to personally talk with Peter Cinque in the intensive care unit of the Hospital, without success. The court found him to be in a coma and unable to communicate.
Thus, a man clearly able to make an informed and rational decision right up to the early morning hours of October 17, is now comatose and incompetent.
*481 Dr. Norma Lee Wenger, an internist specializing in nephrology, has treated Peter Cinque since 1979. She testified that his kidneys were destroyed, do not function and cannot remove toxic waste. He requires maintenance hemodialysis three times a week, for a total of 12 hours, in order to survive. Without dialysis Peter Cinque will be dead within one week or sooner.
Dr. Wenger stated that Peter’s condition of blindness, end stage renal failure, peripheral neuropathy and brain damage are irreversible and incurable. Although she stated, at one point in her testimony, that he was not terminally ill, she said that his life expectancy on dialysis was six months, and even less than six months in view of the recent brain damage. In her words, with continuing dialysis treatment, he will be terminal in six months or less. Dr. Wenger stated that the termination of dialysis would not be a painful experience.
According to the Cinque family, Peter Cinque, while competent, did clearly and unequivocally make an informed decision to refuse further dialysis treatment. They offer substantial evidence in support of this significant contention.
Vincent Cinque, Anthony Cinque and A. P. Cinque, brothers, testified as to Peter’s constant pain and despair, and his decision not to continue to live in this hopeless manner. Nicholas J. Cinque, another brother, stated that Peter told him in early October that he did not want to be kept alive artificially, because of the pain; and that, on October 14, 1982, Peter said, “I want this artificial means of keeping me alive ended.”
Mary A. Biondo, his only sister, testified that in February, 1982, Peter announced to the family that he wished to go off dialysis. On October 11,1982, Peter’s birthday, they discussed his decision to discontinue his dialysis, and Mary assured him that she and all the family would support him. On Friday, October 15, Mary put the question to Peter directly. “I am aware of your discussion with Mark and your decision to discontinue dialysis. Do you still want to go ahead with it?” she asked. He said, “Yes.”
Peter had been living with his mother, Maria B. Cinque. She had been taking care of him. She discussed the subject *482 of dialysis with her son who said he was suffering so much, he wanted to die. Peter wanted to stop the dialysis. At the time of this hearing, Peter’s mother sadly agreed that treatments should be ended.
Mark Cinque, a brother, gave comprehensive and detailed testimony as to Peter’s decision to terminate treatment. Mark assisted his mother in taking care of Peter when he was home. They had discussed ending dialysis. They had obtained advice from the clergy as to what, in conscience, Peter could do.
On Friday, October 8, Mark discussed the dialysis treatments with Peter at length for an hour and a half to two hours. Peter was continually in great pain. Peter told Mark that he finally made up his mind to stop dialysis, and asked Mark to help him. Peter said, “I am ready to die. I am ready to stop dialysis.” As a practicing Catholic, Peter said he was prepared to meet God and obtain the happiness after death which awaited a person who lived a good life. “Please assist me in working out the legalities,” asked Peter. At that time, Peter was conscious, lucid and clear. It was an informed decision by Peter to discontinue dialysis. In the days that followed, Mark saw Peter every day and was met with questions as to his progress in obtaining the approval of the Hospital as to the decision already made by Peter. During this time, the Cinque family started a 24-hour shift whereby a member of the family was constantly with Peter, who did not want to be alone at this time. Finally, the method to obtain approval of the Hospital was ascertained, and Peter was told that Friday, October 15, was the day he would be allowed to discontinue his treatment. He was taken off general medication so that his mind would be perfectly clear when the psychiatrists examined him so as to ascertain his competency to make this momentous decision. On Friday, October 15, true to his word, Peter refused dialysis, precipitating the situation culminating in the Hospital’s seeking this order to compel him to be treated.
Dr. Wenger, his treating nephrologist and a disinterested and objective witness, testified that Peter told her on Tuesday, October 12 and Thursday, October 14 “that he doesn’t want any further dialysis and how long does it take to have this accomplished?” Further, in her presence, on *483 October 15, Peter initialed two separate written documents evidencing a clear intention to discontinue dialysis treatment. There are two notes in the October 15 progress record in the Hospital chart. One reads as follows:
“Dialysis attempted this a.m. Patient refuses to have treatment. He understands this refusal might endanger his life.”
Signed by Dr. Wenger and a nurse.
Under this note are some marks on the paper identified as the blind patient’s attempts to sign his name. Also affixed to this note in the chart is the signature of Mark Cinque.
Immediately below this note is another printed note which reads as follows:
“Attempted dialysis this a.m. Patient awake and alert, refused treatment. Dr. Wenger present refusal note signed by patient.
“Signed Karen Dermody R.N.”
In addition, Peter Cinque initialed a printed form entitled “Basic acknowledgement of refusal to permit diagnostic or therapeutic procedure.” His “signature” was witnessed by Joseph A. Cinque, Jane Woessner and Adele Lawrence, assistant administrator of the Hospital. This form reads in part, in large capital letters, as follows:
“although my failure to follow the ADVICE I HAVE RECEIVED MAY SERIOUSLY IMPERIL MY LIFE OR HEALTH, I NEVERTHELESS REFUSE TO SUBMIT TO THE RECOMMENDED PROCEDURE.
“I assume the risks and consequences involved and release the above-named physician, his associates and assistants, the hospital, and its personnel, from any responsibility whatsoever for any unfavorable or untoward results caused by my refusal.”
Dr. Wenger testified that when Peter stated his decision to stop dialysis, he was alert, oriented, not under medica *484 tion and in a “mentally capable state”. Dr. Valez, one of the psychiatrists who examined Peter on October 14 and 15, also noted in the record that he was “coherent and relevant” and “is clear with the purpose of stopping dialysis” and “he is aware that will result in his death” and “has made preparation with support of his family.”
The court finds that Peter’s decision to voluntarily cease dialysis treatment does not violate the canons of the Catholic Church. Monsignor Saverio C. Mattei, Pastor of Holy Redeemer Church in Freeport, testified that dialysis is an “extraordinary” rather than an “ordinary” means of treatment. An extraordinary means is defined as something beyond which you are called upon to undergo to sustain life. As an extraordinary means, Peter has the right to accept it or reject it, and he is permitted to make such a decision. Peter told the Monsignor that he would like to “go to the Lord.” Peter would not be in moral jeopardy under the canons of the church if he refused dialysis. Monsignor Mattei opined that if Peter declined to accept dialysis and died as a result, such act would not be suicide.
Father William Singleton, Pastor of St. Raymond’s Parish in East Rockaway, concurred with Monsignor Mattei with regard to the ethical and moral issues referred to above.
Father Donald Babinski of Holy Redeemer Church visited with Peter during the summer of 1982, before the amputation of his legs. Peter stated at that time that he did not want to continue the way he was and that “he was prepared to die.”
REPORT OF THE GUARDIAN AD LITEM
After a review of the Hospital record and the evidence at this hearing, guardian ad litem Stanisci reported to the court that Peter Cinque, prior to October 12, indicated his desire to cease dialysis. The guardian’s oral report continued as follows:
“I have reviewed the reports of the psychiatrists. I have considered the testimony of Dr. Wenger with regard to the patient’s capacity to fully understand and comprehend his *485 request, and it is my recommendation that Mr. Cinque was well aware of what he was requesting, and was well aware of the consequences of his request.
“Further, the religious aspect of it I think had a part in his decision. As a Catholic — and when I say we, being a Catholic, myself — we feel that our life really does not begin until after death, and therefore we have no compunction about death.
“That being the fact, together with his desire to terminate pain, and the pain not only upon himself, but the pain that was inflicted upon his family, or would be inflicted upon his family, I recommend that Mr. Cinque was morally correct in his desire, and that based upon the law as I understand it in the State of New York, he was legally permitted to make such a request, and I recommend that his request be granted forthwith.”
THE LAW
It is well settled in this State that “[e]very human being of adult years and sound mind has a right, at common law, to determine what shall be done with his own body and cannot be subjected to medical treatment without his consent”. (See Matter of Melideo, 88 Misc 2d 974, 975; Schloendorff v New York Hosp., 211 NY 125.)
With the passage of time, and in light of quantum leaps in medical technology, the incidents requiring the application of this rule have been increased. That is, the availability of “extraordinary” means of treatment is increasing. (See, generally, 29 UCLA L Rev 386; 44 Fordham L Rev 1.)
This has culminated in recent decisions of our appellate courts bearing directly on the right of the competent terminally ill patient and, indeed, the incompetent or vegetative terminally ill patient, to effectuate a cessation of “extraordinary means” of treatment. (See Matter of Storar, 52 NY2d 363, commonly known as the Brother Fox case.) In Matter of Storar, Judge Wachtler clearly stated the rule as to the competent patient, as follows: “In this State, however, there is no statute which prohibits a patient from declining necessary medical treatment or a doctor from honoring the patient’s decision. To the extent that existing statutory and decisional law manifests the State’s interest *486 on this subject, they consistently support the right of the competent adult to make his own decision by imposing civil liability on those who perform medical treatment without consent, although the treatment may be beneficial or even necessary to preserve the patient’s life (see, e.g., Schloendorff v Society of N. Y. Hosp., 211 NY 125)”. (Emphasis supplied.)
In Matter of Storar, the Court of Appeals, noting that Brother Fox was incompetent at the time that the particular extraordinary means were applied to his body, nonetheless found that Brother Fox had made, sometime prior to his admission to the hospital, philosophical statements as to his desire not to be subjected to extraordinary means of treatment. Although Brother Fox never stated that he declined to undergo a particular form of treatment, and although he was not ill or in the hospital when he made these statements, the Court of Appeals nevertheless permitted such consent to be effectuated after his incompetency on the grounds that “Brother Fox made the decision for himself before he became incompetent.”
Here, albeit that Peter Cinque is now incompetent, the clear and convincing evidence shows that he made a knowing decision while competent and while undergoing the particular treatment he declined to continue. Therefore, this court need not address the more troubling question involved when a third party makes application to cease treatment for a patient never competent.
Finally, it must be noted that notwithstanding the general rule above cited, certain “compelling State interests” may act as a barrier to the granting of a competent patient’s application. Such interests include the prevention of suicide and/or protection of minor children or other dependents. As in Storar, those concerns are inapplicable here. In this case, Peter Cinque has no children or dependents. Further, Peter Cinque’s medical conditions are not self-inflicted. (See Matter of Storar, supra, pp 377-378, n 6.) See, also, the discussion of suicide in the Appellate Division decision in Matter of Eichner (73 AD2d 431), in which Presiding Justice Mollen states (p 467) that “withdrawal of the respirator evinces only an intent to forego extraordinary measures and to allow the processes of nature to run *487 their course”, and, further, on that subject, stated as follows (p 467): “Hence, there seems to be no public policy against permitting a terminally ill patient to choose not to delay the inevitable and imminent termination of his life — at least insofar as public policy is reflected in the current Penal Law. Such decision, directed to terminating the artificial prolongation of life, cannot be deemed ‘irrational’ in the sense generally connoted by the term ‘suicide’.”
Compare Matter of Von Holden v Chapman (87 AD2d 66), where the court ordered the director of a psychiatric center to force-feed patient Chapman so as to sustain his life, while nevertheless noting with approval the rule set forth in Matter of Storar that a competent adult has a right to determine whether or not to undergo medical treatment.
The doctrine expressed in Matter of Storar was reiterated in People v Robbins (83 AD2d 271). There, it was determined that criminal liability cannot be imposed upon a spouse for failure to summon medical aid for his wife, a competent adult who decided to stop taking all medication for her epileptic and diabetic conditions. The court stated the rule as follows (p 275): “It would be an unwarranted extension of the spousal duty of care to impose criminal liability for failure to summon medical aid for a competent adult spouse who has made a rational decision to eschew medical assistance. In New York such a rationale would be in direct conflict with the related rule that a competent adult has a right to determine whether or not to undergo medical treatment (Matter of Storar, 52 NY2d 363; Schloendorff v Society of N. Y. Hosp., 211 NY 125). There is no basis under New York law for denying an adult the right to refuse medical care where such refusal does not pose a threat to the life or health of others. ‘In this State * * * there is no statute which prohibits a patient from declining necessary medical treatment or a doctor from honoring the patient’s decision.’ ”
CONCLUSIONS
As is stated in Matter of Storar (supra, p 379): “Clear and convincing proof should also be required in cases where it is claimed that a person, now incompetent, left instructions *488 to terminate life sustaining procedures when there is no hope of recovery. This standard serves to ‘impress the factfinder with the importance of the decision’ * * * and it ‘forbids relief whenever the evidence is loose, equivocal or contradictory’ ”.
The court finds, by clear and convincing evidence, indeed, beyond a reasonable doubt, that Peter Cinque made an informed, rational and knowing decision on October 8, 1982, and thereafter, to forego dialysis treatments as of October 15, 1982. Further, the court finds that when Peter made this decision, he was alert, oriented and mentally competent to do so. He was not under the influence of analgesic medication or any other sense-altering substances. This decision was made by Peter with full knowledge that in the absence of the continuation of extraordinary means, namely, his dialysis, his terminal illness would inexorably lead to his demise.
The court finds that his decision to terminate the extraordinary means by which his life span was being prolonged was based on a compelling desire to escape the constant and severe pain caused by his multiple debilitating irreversible and terminal conditions. Further, he found solace and reason for his decision in the tenets of the Catholic Church and in his expectation for a better life hereafter.
Such a decision must be evaluated and determined on a case-to-case basis, depending on the factual situation in each particular case.
Based on the evidence in this case, the decision of Peter Cinque to terminate dialysis treatment is legally permissible under the laws of our State, and his decision will be complied with by the court.
Thus, this court is duty bound, after a full exploration of all the facts underlying this petition, to give effect to the clear, explicit and expressed wishes of Peter Cinque to terminate such treatment.
Accordingly, the Hospital’s petition to continue hemodialysis treatments to Peter Cinque is denied. Such treatments shall terminate forthwith. Further, the application of the guardian and the family of Peter Cinque to forego *489 other extraordinary life preserving treatments, is granted. Also, the direction in the order of October 15, 1982, not to permit his discharge from the Hospital, is vacated.
The court would be remiss if I did not formally extend my sympathy and that of my staff and all the personnel of this court to the Cinque family. While I was duty bound to approach this matter in a professional manner, I must state that this has been a time of personal sadness for me.
This sadness has only been relieved by my knowledge that my function was a necessary one, and that I enjoyed the courtesy and co-operation of the Cinque family, the Lydia E. Hall Hospital staff and the distinguished guardian ad litem.