OPINION OF THE COURT
Bernard F. McCaffrey, J.
This matter concerns a document entitled, "Instructions Relating to Medical Treatment and Death/Refusal of Further Care” (also known as Living Will) of Selma L. Saunders who now asks the court, as a matter of first impression, to rule upon the proposed Living Will and interpret said will and judicially implement her written desires and instructions.
Reduced to its simplest terms a Living Will is a document in which one states, while in good health, what measures he or she does not want used to extend one’s life when one is dying.
The applicant, Selma L. Saunders, is 70 years of age and suffers from both emphysema and lung cancer, and is currently confined to her daughter’s home in Oceanside, New York, where she has oxygen administered to her on an almost continual basis. Her condition is described as being progressive and without current known medical cure.
On or about April 24, 1984, while the applicant was residing in Philadelphia, Pennsylvania, she prepared and executed a Living Will; said document was prepared by her attorneys in *47 Philadelphia. The document is annexed to the moving papers as an exhibit; it consists of a cover page and 3 Vi typewritten pages signed by the applicant and attested to by witnesses.
The applicant petitions the court to make a determination as to the validity and effectiveness of the document within the State of New York. She seeks this relief at this time in order that the document will be operative without the requirement of any further court determination, if certain events in paragraph B of the document occur. Paragraph B provides as follows: "B. If, due to injury or illness, sudden or gradual, I become incompetent, and my condition becomes such that: (1) I am in irreversible coma, in the opinion of my treating physician; or (2) I have been continuously unconscious for a period of one (1) week, and in the opinion of my treating physician, I have suffered severe irreversible brain damage which will permanently render me incompetent (or that even partial physical recovery would be accompanied by severe, irreversible brain damage rendering me incompetent); or (3) my condition is terminal and hopeless and death is imminent; then, as of that time, I withdraw my actual and implied consent to and substitute this refusal of, all further treatment of me by artificial means and devices (such as the use of a respirator) and all further therapeutic or emergency care; and I direct that all further treatment of me or my condition by such artificial means and devices or the rendition of such further therapeutic or emergency care shall cease.”
The document goes on further to state that the determination of the effective time of the "refusal” in paragraph B of the document is a medical decision and empowers the treating physician to make the determination to honor said "refusal” of further medical treatment, applying his own medical judgment. The document further absolves and releases any physician or hospital on account of honoring the "refusal”, and reaffirms said "refusal” as hers and that any physician or hospital is acting in accordance with her own directions. Finally, the document reflects that the applicant is not claiming any so-called "right to die” or any right to commit suicide through this "refusal”. Rather, according to the document, the applicant is insisting upon what she describes as her "right as a competent adult to refuse to submit to medical and surgical procedures although the inevitable consequences of her decision will be my death.”
The respondent, State of New York, appears in this proceeding by the Attorney-General in opposition to the application *48 requesting that it be denied contending that there is no justiciable controversy.
Also as an affirmative defense, the Attorney-General claims it is merely a nominal respondent in this action and, inasmuch as there is no indication that the applicant has had any contact with any State agency or employee relative to her medical treatment, naming the State of New York as a party respondent is improper. Furthermore, it is claimed that the State may only be sued as it has consented to be sued and is otherwise immune from suit and has not consented to be sued as an entity in the Supreme Court of the State of New York, and so the action must be dismissed as the court has no jurisdiction of the subject matter of the action.
A memorandum of law has been submitted by the Society for the Right to Die as amicus curiae. Said society urges the court to find that a Living Will, such as that executed by the applicant, is clear and convincing evidence of a patient’s wishes, which may be acted upon when the patient is incompetent and without hope of recovery.
The society estimates that its members and contributors number 100,000 nationwide, more than 18,000 of whom are in New York. In addition to its members who have requested Living Wills, hundreds of thousands of Living Wills have been distributed on request to people who have not become contributing members. The society estimates that approximately 80,000 Living Wills have been executed in New York.
Although there are aspects of the case at bar wherein it can be said that the application is premature, or not ripe for determination, yet, for all the reasons set forth by the parties, the underlying issue is of public importance and is of a recurring nature of a type that is likely to escape any appropriate court review or determination, because it reaches the court at a time when it is really too late for the court to afford any meaningful relief.
The fact the applicant has not yet entered a specific hospital, or that she has not been denied her choice of medical treatment in the past, is not a sufficient basis on which to deny the application out of hand on technical grounds despite the holding in A.B. v C. (124 Misc 2d 672).
The court finds that even at the present time a substantial controversial issue exists with respect to the applicant’s future rights concerning the manner in which her life and body should be treated in the event her very existence becomes *49 dependent upon artificial life-supporting systems. Such an issue pertaining to a prospective right invokes and does not foreclose an application for declaratory relief. (Borg v New York Majestic Corp., 139 NYS2d 72.)
The court is vested with discretionary power to exercise the right of a declaratory judgment. "CPLR 3001 is a remedial provision the primary purpose of which is to stabilize legal relations and eliminate uncertainty as to the scope and content of present or prospective obligations.” (3 Weinstein-Korn-Miller, NY Civ Prac ¶ 3001.02; see, Barry v Ready Reference Pub. Co., 25 AD2d 827.) The aim of a declaratory judgment is to enable a party whose rights, privileges and powers are endangered, threatened or placed in uncertainty to evoke the aid of the court to obtain a declaration of his or her rights or legal relations. The objective of the declaratory judgment in our practice is to obtain relief from just such uncertainty and doubt. (See, Town of Ohio v People, 264 App Div 220.)
The present action is in the nature of a declaratory judgment as defined by CPLR article 30, which provides at section 3001 as follows: "The Supreme Court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed. If the court declines to render such a judgment it shall state its grounds.”
Furthermore, the court finds that it is properly called upon to declare the meaning of 10 NYCRR 405.25 (a) (7) ("Patients’ rights”) as to its implementation and application to petitioner and to define, in the light of 10 NYCRR 405.25 (a) (7), the effect of a document referred to as a Living Will which the petitioner has executed. (See, Maguire v Monaghan, 206 Misc 550, 554.) Also, rather than to dismiss the petition on technical grounds, the court finds that it is necessary to make a determination on behalf of the petitioner and to set forth the effect of the document for physicians and hospitals dealing with the care of the petitioner in order that there be no need for court orders or concern for their own rights in fulfilling their obligation to carry out the wishes of the petitioner as expressed in said document to the extent, at least, that the court believes it should do so.
Responsible parties who wish to comply with the law in cases where the legal consequences of the contemplated action are uncertain need not act at their peril (New York Public Interest Group v Carey, 42 NY2d 527, 530).
*50 The State of New York does not prohibit a patient from declining necessary medical treatment, nor does it prohibit a doctor from honoring a patient’s refusal. (See, Matter of Storar, 52 NY2d 363.) The court finds that every human being competent and of sound mind has a right to determine what should be done with his or her body and health (see, Matter of Hall Hosp. [Cinque], 116 Misc 2d 477).
It is certainly not against public policy to permit a terminally ill patient to choose not to delay the inevitable and imminent termination of his or her life. (See, Matter of Eichner, 73 AD2d 431.) The right of a patient to refuse life-sustaining treatment in appropriate circumstances is recognized. Said right has, in other jurisdictions, been premised on a constitutional right of privacy (Matter of Quinlan, 70 NJ 10, 355 A2d 647, cert denied sub nom. Garger v New Jersey, 429 US 922), or, alternatively, as in New York, on a common-law right to be free from invasion of one’s bodily integrity. (Matter of Storar, supra.)
The right to refuse treatment, be it founded on constitutional or common-law precepts, is not absolute, for the State has an interest in protecting the sanctity of the lives of its citizens. Said State interest has been identified in the following four areas: (1) the preservation of life, (2) the protection of interests of innocent third parties, (3) the prevention of suicide (apparently all the States have criminal laws prohibiting acts which constitute the promotion of suicide) and (4) the maintenance of the ethical integrity of the medical profession (see, Matter of Eichner, supra; see also, Matter of Colyer, 99 Wn 2d 114, 660 P2d 738).
The right of a person to control his or her own body is a basic societal concept, long recognized in the common law: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law” (see, Union Pac. Ry. Co. v Botsford, 141 US 250, 251).
It has been stated in decisional law by the highest court of this State that, "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient’s consent, commits an assault, for which he is liable in damages.” (Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129-130.)
*51 As a matter of fact, there is a specific expression of the patient’s right to decline necessary treatment promulgated by the Department of Health of the State of New York pursuant to authority of the State Legislature, having the full force and effect of law contained in 10 NYCRR 405.25 (a) (7), which provides as follows:
"405.25 Patients’ Rights, (a) The hospital shall establish written polices regarding the rights of patients upon admission for treatment as an inpatient, outpatient or emergency room patient, and shall develop procedures implementing such policies. These rights, policies and procedures shall afford patients the right to * * *
"(7) refuse treatment to the extent permitted by law and to be informed of the medical consequences of his/her action”.
The doctrine of informed consent is a means developed in law to protect one’s personal interest in the integrity of one’s body wherein no medical procedure may be performed without a patient’s consent, which is obtained after explanation of the nature of the treatment, substantial risks, and alternative therapies. (26 Rugers L Rev 228, 237.)
With regard to 10 NYCRR 405.25, it should be noted that administrative agencies are endowed with legislative powers and junctions, or powers legislative in nature or quasi-legislative with the most persuasive legislative powers conferred being the power to make rules and regulations (2 NY Jur 2d, Administrative Law § 32). The New York Code of Rules and Regulations is an official compilation provided for by NY Constitution, article IV, § 8. Said compilation is prepared by the Secretary of State pursuant to statutory duty (Executive Law § 102 [3]) from all codes, rules and regulations filed with the Department of State by State departments and agencies such as the Department of Health. The validity of 10 NYCRR 405.25 is established by the State Constitution having been filed in the office of the Department of State and published by the State Legislature pursuant to Executive Law § 102-106.
10 NYCRR 405.25 is entitled to be read into evidence in any legal proceeding, is in the public domain and has the full force and effect of law when reasonable and not in conflict with other laws (see, Matter of Jeffers v Duffy, 52 AD2d 730; Park Place-Dodge Corp. v Collins, 75 Misc 2d 25, affd 43 AD2d 910).
It would, of course, be best if the Legislature formulated clear standards for resolving requests to terminate life-sus *52 taining treatment for incompetent patients. As the elected law-making representatives of the People, the Legislature is better suited and equipped than any other single institution to reflect the social value at stake, and it has the resources to collect, compile and analyze the data and opinions and formulate general guidelines that may be applicable to a broad range of situations.
However, the Legislature has not yet adopted laws, rules or regulations to implement 10 NYCRR 405.25 (a) (7) to fit the situation in the case at bar, and the Legislature has not enacted a statute recognizing the validity of Living Wills or prescribing the means to execute such wills, although it has studied the problem to some degree. In the absence of specific legislation on the termination of life-sustaining treatment, the court may not properly avoid the issue that we have been asked to resolve, merely because it is troubling or difficult. Every day, and with limited legal guidance, families and doctors are making decisions for patients unable to do so themselves. The courts, as the guardian of our personal rights, have a responsibility to place appropriate restraints on such private decision-making and to create guideposts that will help protect people’s interests in determining the course of their own lives (see, Garger v New Jersey, 429 US 922, supra).
The right of a terminally ill competent adult to discontinue extraordinary medical treatment is well established. In order to properly address itself to the problem and question presented in the case at bar the court must go a step further and consider the effect of what the petitioner seeks here, when and if she becomes comatose and terminally ill. This court finds that this right of terminally ill competent patients to refuse or to discontinue extraordinary medical treatment is not lost when and if they suffer irreversible brain damage, become comatose, and are no longer able to personally express their wishes to refuse or discontinue the use of extraordinary artificial support systems. This is clear from a reading of the Storar decision (52 NY2d 363, supra), which takes into account so fully and completely the expressed wishes and desires of the patient at a time that patient was fully competent and able to express his or her wishes on the subject. How this can be effectively done is the question before this court.
By concluding that terminally ill comatose patients have the right to refuse or discontinue extraordinary means of artificial life-support devices, we must acknowledge, also, that since incompetent persons may not exercise this right while *53 they are incompetent, there must be provided a means by which this right may be exercised on their behalf, otherwise it will be lost.
The court is presented with a document called a Living Will, which the court is asked to give effect declaring that it is a valid will, legally binding to accomplish what the petitioner intended. This the court cannot do because only the Legislature has the authority to enact a statute recognizing the validity of Living Wills, prescribing the means of execution of such documents, and the general guidelines that may be applicable to a broad range of situations. Otherwise, the court would be usurping the providence and function of the Legislature and attempting to impose its guidelines on the situation before it. The general problem is best left to an institution such as the Legislature.
The petition, in this instance, seeks a hearing as to the competency of petitioner in the execution of the document referred to as a Living Will. The court finds that such a hearing is not necessary. Competency is presumed as the normal condition of a person until the contrary is shown (64 NY Jur, Wills, § 164; see also, 27 NY Jur, Incompetent Persons, § 6). Not only is the petitioner’s competency in this case not challenged, the respondent Attorney-General, in their oral arguments before the court, agrees that such a hearing is not necessary. In addition, the petitioner has furnished a medical affidavit from an attending physician attesting to her soundness of mind and competency to handle her own legal affairs. The court also notes that to hold otherwise would require, based upon information before it, that over 80,000 such hearings could be required just of those furnished with similar documents by the amicus curiae.
Although the utilization of a limited durable power of attorney is urged as a viable alternative to the concept of Living Will until the State Legislature enacts statutes dealing with the Living Will, the durable power of attorney requires the delegation of a third party to act on behalf of the petitioner. It is precisely this transference to some third party (such as a family member) the responsibility of determining petitioner’s life-death situation which petitioner seeks to avoid as she strives to maintain her own right of self-determination.
The court itself has concerns about the use of a power of attorney on a case such as that at bar because although durable power statutes exist in all 50 States "the application *54 of the durable power to making health care decisions on behalf of principals has not been widely used and is not completely certain” (Society for the Right to Die, Handbook of Living Will Laws 1981-1984).
The court emphasizes that except as specifically set forth herein, it does not pass upon the form and context of the document submitted by the petitioner referred to as a Living Will. In particular, the court does not pass upon section (2) of paragraph B of said document which calls for the refusal or discontinuance of medical care by artificial means and devices upon the happening of certain enumerated or specified events such as her being "continuously unconscious for a period of one (1) week”, etc. The court deems such matters which involve the setting of standards to be outside the realm of the judiciary and best left to the Legislature.
The court instead deems the document before it to be in the nature of an informed medical consent statement authorizing the refusal or discontinuance of further medical treatment in petitioner’s case by artificial means and devices. Thus, to the extent granted by the court the petitioner’s wishes are entitled to be fulfilled without need for additional costly, time-consuming and traumatic court proceedings in the course of the natural death process should she become incompetent to continue to express her wishes.
Thus, in the absence of the Legislature to adopt or enact a statute that would otherwise recognize the validity of a Living Will, or to formulate guidelines that would spell out how the patient’s rights in the case at bar, under 10 NYCRR 405.25 (a) (7), can be carried out when that patient is terminally ill and near death and becomes comatose or otherwise incompetent the court declares the following:
(1) The court deems the document executed by the petitioner to be in the nature of an informed medical consent statement by her authorizing the refusal or discontinuance of further medical treatment by artificial means or devices when or if she is terminally ill, with death imminent and suffers irreversible brain damage and becomes comatose and no longer able to express her wishes (hereinafter, the "stated condition”).
(2) The document executed by the petitioner is evidence of the most persuasive quality and is a clear and convincing demonstration that while competent the petitioner clearly and explicitly expressed an informed, rational and knowing deci *55 sion to decline certain medical treatment by artificial means and devices while in a terminally ill state or condition and it should be given great weight by the hospital authorities and treating physicians attending her.
(3) That the right to discontinue medical treatment by means of artificial means and devices is not lost when and if the petitioner is found to be in the "stated condition” specified in (1) above and is no longer able to personally express her wishes to refuse or discontinue medical treatment by use of artificial means or devices.
(4) No further judicial proceedings or court order is required for the discontinuance of medical treatment by artificial means or devices if such discontinuance is in accordance with accepted medical practices said petitioner is found to be in the "stated condition” specified in (1) above.
(5) That in order to be relieved of potential civil and criminal liability in honoring the aforesaid request of the herein petitioner when she is in the "stated condition” specified in (1) above, physicians, hospitals, or their administrators need only act in good faith with respect to the proper treatment of the petitioner in honoring their respective professional oaths and duties to render proper care in the light of the patient’s rights under 10 NYCRR 405.25 (a) (7), and that for them to be held civilly or criminally liable, there must be a showing that their actions were not in good faith, but were intended to harm the patient.
The determination herein in no way represents the indorsement of a choice of death over any form of viable life. Rather, it attempts to recognize that there is truly a distinction between curing the ill and comforting and easing the dying, and permitting death to come in a natural, dignified and peaceful manner, where that is the sacred, rational, knowing wish of the terminally ill patient.
Accordingly, to the limited extent hereinabove indicated the petition is granted; in all other respects the petition is denied.