OPINION OF THE COURT
Stanley Parness, J.
In this application, petitioner hospital sought authorization to perform an emergency amputation on an elderly patient, Sadie Weinstein. A hearing was held and an order entered which denied the application. The following are the court’s findings of fact and conclusions of law.
The patient is a 74-year-old, partially paralyzed and aphasic nursing home resident who was brought to the hospital on July 1987 as a result of having sustained a new stroke. Following her admission, she suffered an occlusion or clot of the left iliac artery and vein which has impeded circulation in her left leg. As a result, a gangrenous condition of the foot has developed which is spreading to the leg. Though not as yet septic, the prognosis is that if a midthigh amputation is not performed immediately, sepsis will occur resulting in her death within a matter of weeks. This contemplated surgery is vigorously opposed by the patient’s sister, Lillian.
The court must thus determine firstly, whether the patient is mentally incapacitated from participating in the decision process and, secondly, whether the proposed medical treatment is warranted. (Rivers v Katz, 67 NY2d 485, 497.)
With respect to the patient’s mental condition, the hospital produced a staff attending neurologist who testified that patient had some two years prior suffered a massive cerebral occlusion (stroke) which left her completely paralyzed on the right side, including limbs. In addition, she is aphasic, which not only prevents her from communicating, but also makes her incapable of understanding or decoding speech. In essence, this patient has very little cognitive function. Though she may *933 feel pain, she probably does not realize it as such. Her physical responses to external stimuli are at best haphazard. She is completely bed-bound and, since her latest episode affected her ability to swallow, she must be fed through a naso-gastric (N/G) tube. In the neurologist’s opinion, the patient presents a neurological condition which not only is irreversible, but which can be expected to deteriorate further.
The staff psychiatrist confirmed this opinion and concluded that the patient is unable to understand the nature of her illness and make any reasoned judgment with respect to her medical needs. From the testimony and from the court’s own viewing of the patient and attempts to communicate with her, a clear and convincing showing has been made that this patient is mentally incapable of making a decision concerning her medical care and that such incompetency is permanent.
On the need for surgery, the court heard testimony from the acting chief of the surgery service at the hospital. In addition, it also heard from a vascular surgeon associated with a different hospital whose services were obtained through the egis of the court for an independent evaluation of the patient’s need for surgery. Both surgeons agreed that if the amputation were not performed, death would almost certainly occur within a matter of weeks.
All doctors, including the patient’s internist, agreed that the patient, in her paralyzed and physically debilitated condition, is a poor or at best a "fair risk” to survive the surgery proposed.
One can best understand the patient’s present state by contrasting it with her condition at the nursing home. Though paralyzed, aphasic and bed-bound, she was able to move herself in bed. She had use of her left hand and learned to feed herself. At times she could be helped out of bed and had some limited mobility by use of her good left foot. She was able, through left hand and facial gestures, to communicate in a minimal way, a few of her simple needs such as for toilet-ting or food. She also had some awareness or sense of persons near her though unable to recognize them.
Presently, by reason of the gangrene, she no longer has use of left leg (nor will she if amputation occurs). She can no longer swallow and must be fed through an N/G tube, and that must continue even if the surgery is successful. She no longer is capable of communicating in any manner and evinces no awareness of her surroundings. If she survives *934 surgery, she will be completely helpless. Constant care and attention will be required, so as to avoid the ulceration and infection to which immobile patients are particularly susceptible.
Lillian, the patient’s sister and only relative, strongly opposes the surgery. She has lived with the patient all of her life and they worked for many years for the same employer. She describes her sister as an outgoing person who had never been seriously ill before she sustained the stroke two years earlier. She testified that the stroke left her sister angered, and that she can sense that her sister continues to have pain on the paralyzed side. Because of her close relationship with her sister, Lillian can state unequivocally, that if asked, the patient would refuse the contemplated surgery. She refers to some prior conversations with her sister concerning persons in wheelchairs, and her sister commenting that "that was no way to live”. She is also concerned that her sister may have more awareness at times than is thought and, that if her sister sensed that her leg was gone, "the shock would kill her” since she would be unable to comprehend what happened.
The determination as to whether medical treatment or surgery should be withheld from an incompetent patient implicates two potentially competing interests; on one hand, the interests of the State, as parens patriae, in preserving the life of its citizens and, on the other, the individual’s right of privacy, i.e., the right not to be subjected to invasive medical procedures that have not been consented to. (Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129.)
There is no question that a competent adult has the right to refuse treatment and that this right, in the absence of special circumstances, prevails over the State’s parens patriae interests. This is so even if the treatment rejected or terminated will result in death. (Schloendorff v Society of N. Y. Hosp., supra; Matter of Erickson v Dilgard, 44 Misc 2d 27; Public Health Law §§ 2504, 2805-d; Superintendent of Belchertown State School v Saikewicz, 373 Mass 728, 370 NE2d 417, 424.) But the extension of such refusal right to incompetent patients presents a more complex issue.
Courts recognize that incompetent patients do not lose their constitutional right to privacy merely because of their incompetency (Rivers v Katz, supra, at 495) and that under certain circumstances a right to refuse life-prolonging or life-sustaining procedures may be exercised in their behalf as an aspect *935 of such right to privacy. (Matter of Eichner, Matter of Storar, 52 NY2d 363.) In Eichner, an adult now comatose had at one time expressly stated a desire that life-sustaining measures not be undertaken if recovery was hopeless. The court in that circumstance permitted the withdrawal of such measures. The employment of this "subjective test” to determine what choice the patient would make if competent, and then to accede to his wishes, has been followed in this State (Matter of Delio v Westchester County Med. Center, 129 AD2d 1; Matter of Strauss, NYLJ, July 30, 1987, at 12, col 3; Matter of Hall Hosp., 116 Misc 2d 477; Saunders v State of New York, 129 Misc 2d 45) and in others (In re Quinlan, 70 NJ 10, 355 A2d 647; Barber v Superior Ct., 147 Cal App 3d 1006, 195 Cal Rptr 484; In re Severns, 425 A2d 156 [Del]; Kennedy Mem. Hosp. v Bludworth, 452 So 2d 921 [Fla]; Leach v A Kron Gen. Med. Center, 68 Ohio Misc 1, 426 NE2d 809).
Where, as in the instant case, there is no compelling evidence of the incompetent patient’s wishes, the law in this State is at best unsettled as to when, if ever, life-prolonging measures may be withheld.
Clearly, medical treatment may not be withheld from an incompetent because some third party thinks that death would be best for one suffering from an incurable illness. (Matter of Storar, supra; People v Eulo, 63 NY2d 341.) It certainly would not be appropriate for a court to determine that someone’s life is not worth living simply because in its subjective opinion the patient’s quality of life or value to society is negligible. The fact that a patient’s functioning is limited or his prognosis poor does not necessarily mean that he is not deriving something from life or that it is in his best interests to die. To undertake these evaluations would "create an intolerable risk” for those who are "socially isolated” and mentally defenseless. (Matter of Conroy, 98 NJ 321, 367, 486 A2d 1209, 1233.)
However, many courts have recognized the existence of certain factual circumstances which may warrant the withholding of medical care as being in the incompetent patient’s best interest even when he had not prior to his incapacity expressed his wishes concerning life-prolonging procedures. (Matter of Conroy, supra; Foody v Manchester Mem. Hosp., 40 Conn Supp 127, 482 A2d 713; In re L. H. R., 253 Ga 439, 321 SE2d 716; Matter of Spring, 380 Mass 629, 405 NE2d 115; Matter of Torres, 357 NW2d 332 [Minn]; Matter of Colyer, 99 Wash 2d 114, 660 P2d 738; Matter of Hier, 18 Mass App 200, *936 464 NE 959; In re Barry, 445 So 2d 365 [Fla]; In re P. V. W., 424 So 2d 1015 [La].)
This issue and the related one as to the degree or intensity of medical treatment that should be given to the incompetent, incapacitated frail elderly, present an ever-increasing dilemma not only to their physicians and families, but also to the courts which are called upon to resolve what is essentially one of the most difficult social and ethical issues of our times.
In Matter of Conroy (supra), the New Jersey Supreme Court was confronted with a patient with medical and mental disabilities strikingly similar to those confronting Sadie Weinstein. Claire Conroy was an elderly nursing home resident with marked senile dementia and almost no intellectual capacity or cognition. She was arterosclerotic and had a gangrenous foot. She could not speak or swallow and required an N/G tube. What was contemplated was discontinuance of N/G nutrition. The result thereof would be death within a short period of time. No evidence could be adduced as to what her wishes might be had she been able to express them. The court, nevertheless, recognized that her best interests might warrant permitting her to die. However, a twofold balancing test was proposed to determine if life-sustaining procedures should be withheld.
Where there is some indication that the patient" would reject treatment, but the evidence thereof is not sufficiently compelling in itself to warrant reliance, an additional requirement would have to be met. It would have to be shown that the net burden to the patient of continued life "markedly outweighs” any "physical pleasure, emotional enjoyment, or intellectual satisfaction” that the patient still may derive from continued life. This the court referred to as the "limited-objective test”. (Matter of Conroy, supra, 98 NJ, at 365, 486 A2d, at 1232.) Where there is no evidence whatever as to the patient’s wishes, the court would still not necessarily foreclose the patient’s right to die if that was appropriate. In that circumstance, the court would apply what it referred to as the "objective test”. It would require not only that the balancing test be met, i.e., burden of continuing life markedly outweighing its benefits, but an additional showing that to prolong life would be inhumane.
Neither our courts nor Legislature have, as the New Jersey court has, directly addressed the issue as to when, if ever, life-prolonging procedures can be withheld when no evidence is available as to the incompetent patient’s wishes.
*937 Matter of Eichner (supra) is helpful only in a limited sense. Though establishing the general principle that treatment may be withheld from a patient though he be incompetent to presently express his wishes, the court predicated its decision on the express wishes of the patient, Brother Fox, made at a time when he was competent (the subjective test).
In Storar (supra) there was no evidence of the patient’s wishes, nor could there be because of the child’s life-long retardation. However, the fact that the court did not permit the mother to withhold transfusions should not be interpreted as foreclosing the possibility of humane actions through surrogate decision-making which may involve withholding life-prolonging treatment for persons who never spoke on the issue.
It is inconceivable that the court by its decision in Storar (supra) intended that life-prolonging procedures in every case be imposed upon such "silent” patients no matter what the circumstance or detriment. Nor could it be the court’s intention that the right not to be subjected to such measures belongs only to those few incompetents sufficiently prescient to execute "living wills” or with friends or relatives merciful enough to "remember” some past appropriate statement made by the patient.
That such broad a statement of policy is not what the court intended is readily apparent from the very language in Eichner and Storar, where the court was careful to state that "any guidance we may provide for future cases is necessarily limited * * * [o]ur [the court’s] role * * * is limited to resolving the issues raised by facts presented in particular cases” (supra, 52 NY2d, at 370).
From the foregoing I conclude that if the right to refuse treatment and allow life to terminate through natural forces is to be regarded as a valuable incident of the right to privacy, such right should not be rejected solely because the incompetent patient may not have sufficiently, at any time, manifested his wishes. Further the fact that a decision against continued life is an unpleasant or difficult one to make should not militate against it, if to do otherwise would be to subject the patient to unnecessary suffering.
But who should make the decision? Obviously, it would be best if it were made, as in the past, by the family in consultation with the patient’s physician. However, in the absence of family, or where, as a result of the choices now being made available through advances in medicine, there is a dispute or *938 uncertainty as to which course to take, the only places presently available for resolution of these issues are the courts. Perhaps, this is as it should be because such questions of "life and death seem to * * * require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of government was created.” (Superintendent of Belchertown State School v Saikewicz, supra, 373 Mass, at 759, 370 NE2d, at 435.)
Having thus concluded that in a proper case that a life-prolonging procedure may be withheld from an incompetent who may not have declared himself on the issue, what must then be determined is upon what factors should such a decision be based. Clearly, some objective standards must be employed. Otherwise, these matters will turn merely on the subjective attitudes or personal beliefs of those making the decision. The danger in that is obvious.
In the absence of more specific legislative or judicial guidance, the approach suggested by Matter of Conroy (supra) and related cases (i.e., the net burdens of prolonged life weighed against the benefits the patient will derive if life continues) provides a general framework within which to determine, in a specific case, whether a life-prolonging procedure may be withheld from an incompetent patient. This weighing of the benefits and burdens that will result from a contemplated procedure is consistent with the concept set forth by the Court of Appeals in Rivers v Katz (67 NY2d 485, supra) which dealt generally with the medical treatment of incompetents. Acknowledging that deference must be given to a patient’s right of privacy, the court in Rivers required that a best interests evaluation be made before treatment may be imposed. Essentially, the court required a weighing of the "benefits to be gained”, the "adverse side effects” and "any less intrusive alternative” procedures (supra, at 497-498).
Further, this approach is consistent with that set forth in the new Mental Hygiene Law § 80 which creates "surrogate decision-making committees” to act on behalf of patients at mental hygiene facilities who are faced with the need for "major medical treatment” (which by definition includes serious surgery). Under this statute, these surrogate decision-making committees can consent to the treatment on behalf of the patient only if they find that he lacks capacity to consent or reject the treatment and if the treatment is in the patient’s "best interests”. "Best interests”, as defined by the statute, "means promoting personal well-being by the assessment of *939 the risks, benefits and alternatives to the patient of a proposed major medical treatment, taking into account factors including the relief of suffering, the preservation or restoration of functioning, improvement in the quality of the patient’s life with and without the proposed major medical treatment and consistency with personal beliefs and values known to be held by the patient” (Mental Hygiene Law § 80.03 [d]). No treatment can be imposed until such "best interests” are established by a "preponderance of the evidence” (Mental Hygiene Law § 80.07 [f]).
Though the use of the surrogate decision-making committee process is inapplicable to the instant case, this statute is significant in several respects: first, it indicates that the Legislature recognizes and sanctions surrogate decision-making for incompetents where serious medical choices must be made. Second, it recognizes such decision-making even where there is a lack of indication as to what choice , the patient would make, if able. Third, by providing a "best interests” standard which requires the weighing of "risks, benefits and alternatives” of the contemplated procedure, the Legislature has provided, at the very least, the context within which such decisions should be made.
However, before discussing what specific factors should be taken into account in determining what are in the patient’s "best interests”, certain general considerations appear to this court to be particularly relevant in all cases where the proposed course of medical intervention will have an immediate life or death impact and, where the patient’s actual wishes in the matter are uncertain.
Since an incompetent patient cannot choose for himself, the presumption should initially be that he would choose life and favor any procedure which sustains, prolongs or enhances life, and this presumption should prevail unless it be established by clear and convincing evidence that the burdens of continued life for this patient markedly outweigh the benefits that furthering life would bring. "Clear and convincing” proof is a more appropriate standard than "preponderance of evidence” to determine the patient’s "best interests”, when the decision will so directly affect the length of time the patient will continue to live. Secondly, no procedure should be withheld if to do so would conflict with any prior contrary wishes of the patient, or would be inconsistent with his character or beliefs. Further, no life-shortening course of action should be contemplated unless the patient is, at the very least, suffering from *940 severe and permanent mental and physical debilitation and with a very limited natural life expectancy. Lastly, the focus must always be on attempting to ascertain what is or would be the particular patient’s choice in the matter, rather than on any broader societal or ethical interests which may be implicated.
With respect to whether the burdens to a particular patient from prolongation of life "markedly outweigh” the benefits, the following factors should be considered:
1. the age of the patient;
2. the life expectancy with or without the procedure contemplated;
3. the degree of present and future pain or suffering with or without the procedure;
4. the extent of the patient’s physical and mental disability and degree of helplessness;
5. statements, if any, made by the patient which directly or impliedly manifest his views on life-prolonging measures;
6. the quality of the patients’s life with or without the procedure, i.e., the extent, if any, of pleasure emotional enjoyment or intellectual satisfaction that the patient will obtain from prolonged life;
7. the risks to life from the procedure contemplated as well as its adverse side effects and degree of invasiveness;
8. religious or ethical beliefs of the patient;
9. views of those close to him;
10. views of the physician;
11. the type of care which will be required if life is prolonged as contrasted with what will be actually available to him;
12. whether there are any overriding State parens patriae interests in sustaining life (e.g., preventing suicide, integrity of the medical profession or protection of innocent third parties, such as children).
This list is in no way intended to be definitive, but only to suggest some of the considerations which should be taken into account when resolving these issues.
Considering the facts in this case in the context of the factors and considerations heretofore discussed, the court concluded that by clear convincing proof, the proposed amputation of Sadie Weinstein’s leg was not in her best interests, i.e.. that the burdens that would attend from the continued *941 life that the surgery might give her, markedly outweigh any benefit she might have from such living. Indeed, such prolongation of her life would be simply cruel.
Ms. Weinstein is presently without any functioning intellect or meaningful awareness of the life around her. Though not entirely comatose, she is, for all practical purposes, merely existing. She cannot understand or speak. Her paralysis has left her immobile on her right and her left side is now affected. Thus, she will never be able to move on her own. Even if she can withstand the surgery, her debilitated condition can only be expected to worsen.
Life has no meaning for her. She derives no physical or emotional pleasure of any degree, nor any intellectual satisfaction in her day-to-day existence. She will remain completely dependent on others. Whether she will receive the intense and almost constant nursing care required to keep her comfortable and free from bed ulcers and infection is doubtful. She will always need an N/G tube which, aside from its discomfort, poses a continuing risk of aspiration and pneumonia.
Thus, whether surgery is performed or not, her prognosis for continued life is poor. Though not performing the amputation will cause some pain when sepsis initially occurs, it is treatable with palliatives, causing no more pain, than would occur postoperatively. Consideration should also be given to the fact that the patient is arteriosclerotic and a prime candidate for future strokes with additional disability and pain. Of further importance in this matter was the opinion of the independent surgeon, who when asked stated he would be reluctant to recommend surgery for this patient. He felt it was both medically and ethically unsound, since its net medical benefit would be marginal. The fact that the patient’s frail condition makes her at best only a fair risk to survive the surgery also militates against it.
The court finds significant the testimony of the patient’s close and caring sister, Lillian, who is particularly qualified to give an opinion as to what her sister’s wishes would be. The views expressed by Lillian about her sister’s feelings are consistent with the tenor of Sadie’s life. Thus, while there is no definitive statement from Sadie Weinstein, the evidence does suggest that she would not want her life prolonged and would reject this surgery. True, unlike the patients in Eichner (52 NY2d 363, supra) and Delio (129 AD2d 1, supra), Ms. *942 Weinstein is not completely comatose. Functionally, however, she is not far removed from that state. Certainly, she is more mentally and physically debilitated than the patient in Storar (supra), and the procedure contemplated (amputation) is much more invasive and with much greater risk potential than the blood transfusions proposed in that case. Indeed, to this court, of particular significance is the fact that what is contemplated herein is not a benign procedure, but serious surgery which will result in the loss of most of her left leg. Certainly the State’s interest in preserving life becomes less compelling "as the degree of bodily invasion increases and the prognosis dims.” (In re Quinlan, supra, 70 NJ, at 41, 355 A2d, at 664.) Lastly, there is no compelling State parens patriae interest with which to be concerned. The sole question is what is best for Sadie Weinstein.
In sum, other than to afford this patient the potential for limited additional life, the proposed surgery offers her no other benefit. If performed it would not to any degree return this patient to an integrated functioning or cognitive existence. (Matter of Dinnerstein, 6 Mass App 466, 380 NE2d 134, 138.) It would, at best, unnecessarily prolong the natural process of her dying. There is no human or humane benefit to be gained from subjecting Sadie Weinstein to the pain and body mutilation this surgery will present. She should be permitted to die with dignity.