Dee ROSS, as personal representative
of the estate of Hector O.
Rodas, Plaintiff,

v.

HILLTOP REHABILITATION HOSPI-
TAL, a Colorado corporation, and
William Cobb, M.D., Defendants.

Civ. A. No. 87 F 187.

United States District Court,
D. Colorado.

Dec. 31, 1987.

Anne C. Stark, Charles M. Johnson, Elaine M. Welle, David H. Miller, Denver, Colo., for plaintiff.

Laird T. Milburn, Grand Junction, Colo., for defendant Hilltop Rehabilitation Hosp.

Daniel R. Christopher, Denver, Colo., for defendant William Cobb, M.D.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

This case arises from a course of tragic events which took place in Grand Junction, Colorado, between the dates of June 17 and August 22, 1986, when Hector O. Rodas elected to forego life supporting medical treatment. Mr. Rodas died on February 6, 1987. Treatment for Mr. Rodas was extended by defendants Hilltop Rehabilitation Hospital and attending physician William Cobb, M.D. Dee Ross, personal representative of Mr. Rodas, filed this action on February 4, 1987.

Jurisdiction is based on 28 U.S.C. Sections 1331 and 1343. Plaintiff asserts claims for deprivation of Mr. Rodas' civil rights under 42 U.S.C. Section 1983 and for discrimination because of his handicap under Section 504 of the Rehabilitation Comprehensive Services, and Developmental Disabilities Act of 1978, 29 U.S.C. Section 794 (the "Rehabilitation Act"). Relief re-

**1530**

quested includes damages for deprivation of the right of privacy of Mr. Rodas, failure to cease treatment as requested, and attorney fees. This matter is before us on cross motions for summary judgment. We grant summary judgment in favor of defendants Hilltop and Dr. Cobb, and deny summary judgment in favor of plaintiff Ross.

## I.

## BACKGROUND

On February 10, 1986, Mr. Rodas, a thirty-four year old Guatemalan male, suffered a cerebral vascular stroke following self inflicted intravenous drug use. This medical condition resulted from an occlusion of his basilar artery which supplies the brain stem. At the time of the traumatic incident, Mr. Rodas was taken to St. Mary's Hospital in Grand Junction by his wife and an emergency rescue squad. He remained in the hospital until March 5, 1986, when he was admitted to Hilltop, a private nonprofit corporate institution.

As a result of his stroke, Mr. Rodas was left in a locked-in state in which his mind was intact and functioning, but his body was severely physically disabled. He was paralyzed from the neck down and was unable to speak or swallow. With considerable effort he could move his eyes and turn his head. He had little control over the muscles of his body and retained slight movement of his feet, toes, and hands. He needed assistance from other people with his bodily needs and functions. While he was able to sense his bodily functions, he had little control over them.

He responded to yes-or-no questions by movement of his head and communicated in more detail through the use of a letter board. At the time of his initial hospitalization, he was fitted with a gastrostomy tube placed in an opening into his stomach. The tube was used to supply medication, nutrition, and hydration. During the relevant time, Mr. Rodas was not comatose and was never on a respirator.

On June 17, 1986, Mr. Rodas communicated to a Hilltop aide, by way of the letter board, that he no longer desired to have the gastrostomy tube in place and desired to have medication, nutrition, and hydration through the tube discontinued. The message was passed on to Dr. Cobb and Hilltop administrators, who immediately contacted the attorney who had been representing Mr. Rodas. Dr. Cobb was concerned about the mental ability and capacity of Mr. Rodas to make a decision as to refusal of fluids. As a result, Hilltop and Dr. Cobb filed a probate action in the state district court.

## II.

## LEGAL, MEDICAL, AND ETHICAL QUESTIONS

In her motion for partial summary judgment, plaintiff contends that defendants deprived Mr. Rodas of his constitutional rights and violated Section 1983 and Section 504 of the Rehabilitation Act. Plaintiff argues these violations occurred due to defendants' medical treatment of Mr. Rodas against his will and without appropriate court authorization during the period from June 17, 1986 until August 22, 1986. Plaintiff asserts this case involves the "relatively straightforward legal question: Without court authorization, may a hospital or treating physician unilaterally override the medical treatment decisions made by a competent and informed patient?" (Plaintiff's memorandum in support of motion; p. 1.)

We disagree. The legal issues involved in this case are far more complicated than posited by plaintiff. The causes of action before us involve claims under Section 1983 and the Rehabilitation Act. Resolution of these claims involves determining the liability of a medical facility and physician under Section 1983 and the Rehabilitation Act for treating a patient who has requested termination of medical treatment when they have serious doubts as to the patient's mental capacity.[1]

---

**1.** Some cases refer to "mental competency". We prefer the issue to be one of "mental capaci- ty".

It is significant that few federal court precedents have been cited to the court dealing with the issues involved. As a result, the simplistic issue suggested by plaintiff is overshadowed by a greater and more difficult maze of legal-medical, ethical, and practical inquiries. (See Appendix for a discussion of recent case law and treatises on right to refuse medical treatment issues.)

## III.

### STATE DISTRICT COURT SUIT

A. *Initial Proceedings of the State Court*

The legal proceedings concerning Mr. Rodas began on August 22, 1986 when Hilltop and Dr. Cobb filed a petition in the Mesa County, Colorado, District Court. The case, entitled *In the matter of: Hector O. Rodas*, Case No. 86 PR 139, was presided over by the Honorable Charles Buss, District Judge. The petition requested appointment of a guardian for Mr. Rodas and a declaratory judgment on the issues of whether Mr. Rodas had a right to terminate his life at Hilltop through disconnection of the tube.

Mr. Rodas contested the petition, asserting a guardian was not necessary, and that he had the requisite mental capacity to refuse further medical treatment. Mr. Rodas' initial response to the petition did not raise claims under the Rehabilitation Act. However, his amended response included assertions under the Act.

Mr. Rodas also requested a determination that delays in the state court action and Hilltop's continued treatment of Mr. Rodas were a violation of his constitutional right to privacy. However, the issues were not raised until a few days before trial, and the state court denied Mr. Rodas the right to amend the complaint to assert these civil rights claims.

Commencing December 16, 1986, the state court conducted a thirteen day trial. An opinion was issued on January 22, 1987, which was later amended on April 3, 1987. A brief summary of the pertinent portions of Judge Buss' opinion follows.

B. *Summary of District Court Opinion*

Early in the proceedings, the state court appointed a temporary guardian and ordered him to maintain the feeding and hydration of Mr. Rodas pending final determination of the case. Dr. Schraa, a neurophychologist, was appointed as the court's expert as to Mr. Rodas' mental capacity. The case was given high priority on Judge Buss' docket but was delayed because of counsels' schedules and the difficulties in finding an expert.

In its recitation of the facts, the state court noted that the gastrostomy tube placed in Mr. Rodas' stomach caused him continual pain, especially when it was touched or moved. Another tube, inserted in his bladder to expel urine, was also painful. Mr. Rodas had to wear a diaper to collect excrement from his uncontrolled bowel movements. The prognosis of all medical testimony was that Mr. Rodas had no chance of improvement or in any way again using his body below the neck.

Although the medical testimony indicated that there was some uncertainty as to how long Mr. Rodas was likely to live, it was medically probable that Mr. Rodas would die prematurely. Further, it was medically probable that he would not live for more than ten years because of his locked-in state.

The facts further indicated that Hilltop and Mr. Rodas' doctors did not think Mr. Rodas needed the in-patient care at Hilltop. However, wherever he went, he would need nursing care twenty-four hours a day. His immediate family could not provide that type of care. Because of his request to terminate treatment, no hospital, nursing home, or hospice close to Grand Junction indicated a willingness to admit Mr. Rodas to their facilities.

At the beginning of his treatment, Dr. Cobb and Hilltop presumed Mr. Rodas had the requisite mental capacity because they assumed he, as most patients, wished to continue living. For several months following his admission, Mr. Rodas did not express any desire to terminate his life or

withdraw from feeding and hydration. However, in late May or early June, Mr. Rodas began to communicate to his doctors and his nursing staff that he wanted to die. Following that time period, he consistently and continually requested that his feeding and hydration be discontinued. Hilltop and Dr. Cobb made efforts to obtain an attorney for Mr. Rodas. On August 5, 1986, Edward Durham, one of Mr. Rodas' attorneys, wrote a letter to Hilltop asking that his gastrostomy tube be removed. On August 21, Mr. Rodas' attorney wrote a letter to the district attorney, suggesting that Hilltop might be committing a continuing battery if it continued treatment of Mr. Rodas. On August 22, 1986, Hilltop and Dr. Cobb filed the state court suit.

The state court found that Hilltop and Dr. Cobb had the burden of proving Mr. Rodas' incapacity because they were attempting to prove he was mentally incapable of understanding the consequences of his decision and therefore should not be permitted to withdraw from treatment. Because the right involved was a significant, constitutionally protected liberty, the clear and convincing standard of proof was applied.

At the time of the trial, all of the psychologists and medical doctors who testified opined that Mr. Rodas did not show signs of acute depression or depression that rose to the level of a mental disorder or mental illness. After hearing many experts in psychiatry, psychology, neurology, and other specialized areas of medicine, the state court determined that Mr. Rodas retained the ability to comprehend and communicate his thoughts, and that he did not suffer from a mental disability or mental illness.

The state court further ruled that Mr. Rodas had a constitutional right to refuse medical treatment. Several tests of legal capacity were applied, resulting in the conclusion that Hilltop and Dr. Cobb had failed to prove by clear and convincing evidence that Mr. Rodas lacked the capacity to make decisions regarding what medical treatment to accept or refuse. The state court

affirmatively found that Mr. Rodas had the mental capacity to make those decisions.

The feeding and hydration of Mr. Rodas through the gastrostomy tube was found to be medical treatment over which Mr. Rodas had the capacity to give or withhold his consent. Mr. Rodas was found to have given his informed consent to terminate medical treatment.

After an extensive and well-reasoned analysis of the facts, Colorado law, and the law of other jurisdictions, the state court held that Hilltop and Dr. Cobb had failed to establish by clear and convincing evidence that Mr. Rodas should not be permitted to exercise the right to refuse feeding and hydration treatment. Further, due to the circumstances surrounding Mr. Rodas' admission to Hilltop, Hilltop was required to allow Mr. Rodas to terminate the medicinal, feeding, and hydration treatment he received and provide him with the necessary nursing care following the cessation of treatment. A surrogate or attorney-in-fact, chosen by Mr. Rodas, was appointed to act on his behalf in the event he became mentally incapacitated as he neared death.

In specific findings on Mr. Rodas' Rehabilitation Act contentions, the state court determined that Mr. Rodas had failed to meet his burden of proof in demonstrating a violation of the Rehabilitation Act.

Finally, Mr. Rodas' request for court appointed counsel was denied. The state court reasoned that Mr. Rodas had a right to be represented by court appointed counsel under the Probate Code if he could not afford to hire one. However, since his attorney agreed to represent him without charge through the American Civil Liberties Union, the Probate Code could not be interpreted to permit court appointed counsel. Thus, the Probate Code did not authorize the use of state funds to pay Mr. Rodas' attorneys.

The petitioners, Dr. Cobb and Hilltop, did not appeal the state court's findings. The only portion of the decision appealed by Mr. Rodas was the court's denial of Mr. Rodas' motion for appointment of attorney and allowance for expenses and costs.

## IV.

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if there are no genuine issues as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion, and all doubts resolved in favor of the existence of triable issues of fact. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed. 2d 63 (1985). Only disputes over facts that might affect the outcome of the suit will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

Plaintiff moves for partial summary judgment that defendants deprived Mr. Rodas of his constitutional rights by violating Section 1983 and the Rehabilitation Act. Plaintiff argues these violations occurred due to defendants' medical treatment of Mr. Rodas against his will and without appropriate court authorization from June 17, 1986 until August 22, 1986.

Summary judgment in favor of plaintiff is inappropriate. Genuine issues of material fact exist as to whether Mr. Rodas had the requisite mental capacity to refuse medical treatment during the time period at issue. Defendants Hilltop and Dr. Cobb had legitimate concerns about whether Mr. Rodas was mentally competent to make an informed consent for withdrawal from medical treatment. Even prior to his paralysis, Mr. Rodas had twice attempted suicide. (Thomas E. Miller Depo. pp. 55–56.) In the Summer of 1986, his wife filed to dissolve their marriage. Throughout 1986, the Immigration and Naturalization Service (INS) sought to deport him to Guatemala. Additionally, the debilitating accident in February 1986 was proximate to these other events. Therefore, during the relevant period, Mr. Rodas had several stressful problems that could readily affect his judgment and mental stability.

When Dr. Cobb learned of Mr. Rodas' desires, he consulted Dale Bowen, Hilltop's Director of Psychology. Dr. Bowen had observed Mr. Rodas since his admission to Hilltop and attributed Mr. Rodas' wish for death to his diagnosis that Mr. Rodas suffered from an adjustment disorder with depressed mood. (Dale Bowen Depo. p. 8.) Dr. Bowen also observed that Mr. Rodas had shown some interest in an electric wheelchair and obtaining a communication device. Dr. Bowen interpreted this as an indication of some interest in becoming involved in long term treatment. (Dale Bowen Depo. p. 9.) Other severely disabled patients at Hilltop had expressed similar feelings as to termination of treatment, but all had eventually changed their minds and had come to terms with their situations. (Dale Bowen Depo. pp. 15–16.)

Upon being informed of Mr. Rodas' wishes, Dr. Cobb wanted an additional psychological evaluation of Mr. Rodas. He communicated this wish to Mr. Rodas, "I told him I felt more detailed psychological testing was needed, and did he concur with that, and he agreed". (William Cobb Depo. p. 52.)

Further, Mr. Rodas and his attorneys were arguably ambivalent about Mr. Rodas' wishes to terminate treatment in June and July, 1986. On August 5, 1986, Mr. Rodas' attorneys made the first formal request that Hilltop and Dr. Cobb cease Mr. Rodas' hydration and nutrition. (Letter, Edward Durham to Hilltop, August 5, 1986, Cobb's Memorandum, Exhibit I.) The request claimed that Mr. Rodas had been evaluated and there was no indication that he lacked mental capacity. However, Dr. Thomas Miller, Mr. Rodas' psychiatrist, had examined Mr. Rodas on July 21, 1986 "for somewhat in excess of an hour". (Letter, Thomas Miller to Edward Durham, August 1, 1986, Cobb's Memorandum, Ex-

hibit J.) Dr. Miller admitted that his opinion was tentative, and that he would not have wanted anyone to rely upon the opinion, given the short amount of time he had to examine Mr. Rodas. (Thomas Miller Depo. p. 69.)

On July 15, 1986, Mr. Rodas' feeding tube became dislodged. Mr. Durham was immediately informed of the fact and told Hilltop's counsel he had no objection to reinsertion of the tube, and the insertion was made. (Edward Durham Depo. pp. 47–48, 54–55.)

Sally Schaefer, a Hilltop administrator, testified that Mr. Rodas initially was told Hilltop could not comply with his request as to termination of treatment

> until we got some legal things sorted out. And I routinely just touched base with him to say, "We're still working on it. Are you okay with that?" And he always indicated to me that he was just fine with that, and he understood that. There was never pressure from him to expedite.

(Sally Schaefer Depo. p. 35.)

Yazmin Griego, Mr. Rodas' sister, opposed disconnection of Mr. Rodas' tube and threatened suit against Hilltop and Dr. Cobb. (Sally Schaefer Depo. p. 41.) Therefore, genuine issues of material fact concerning Mr. Rodas' mental capacity to terminate treatment preclude summary judgment in favor of plaintiff.

We further question plaintiff's assertions that defendants had an unqualified duty to either comply with Mr. Rodas' request to disconnect his tube or to initiate court proceedings to obtain a judicial determination of his mental capacity. At the time of these proceedings, the right to reject nutrition and hydration was not necessarily an unqualified part of the patient's right to reject treatment. The Colorado Medical Treatment Decision Act, Colo.Rev. Stat. § 15–18–101, et seq. (the "Medical Treatment Act"), is not specifically applicable in this action because Mr. Rodas did not execute a declaration under its provisions. Nevertheless, the Medical Treatment Act provides guidance on the right to refuse treatment issue. This "living will" statute

permits comatose and terminally ill patients to prevent the application of life-sustaining procedures. However, specifically excluded from the statutory definition of life-sustaining procedures are procedures to nourish a qualified patient. Thus, the definition of life-sustaining procedures does not include "any procedure to provide nutrition or hydration". Colo.Rev.Stat. Section 15–18–103(7). The Medical Treatment Act arguably suggests that a patient's decision to reject nourishment should not be given the same deference as a decision to reject more intrusive procedures. This is further support for defendants' arguments that the law was not clear at the time of the events at issue.

Plaintiff argues that the law of informed consent was clearly established during the time period of this lawsuit. This contention is unavailing. *Goedecke v. State of Colorado Department of Institutions*, 198 Colo. 407, 603 P.2d 123 (1979), dealt with a mental patient's right to refuse to be forced to undergo treatment with drugs having serious deleterious side effects. The decision did not involve the refusal to receive life-sustaining medical treatment. As Judge Buss held, prior Colorado decisions did not decide the question of "whether a competent adult can refuse medical treatment where his life will end because of that refusal". *In the Matter of Hector O. Rodas*, No. 86 PR 139, slip op. at 25 (Colo.Dist.Ct. April 3, 1987).

The proceedings in state court determined that Mr. Rodas had the right to terminate nourishment and hydration feedings. However, prior to the state court ruling, this was a clouded area of the law in Colorado. Further, it is a substantial leap beyond the state court ruling for this court to make the additional finding that Mr. Rodas had a constitutional right to force defendants to vindicate his rights and assist in his death wish. During the period following Mr. Rodas' request to terminate gastrostomy feeding, the legal obligations of the defendants were unclear. Thus, there are genuine issues of material fact and legal questions precluding the court

from granting plaintiff's motion for summary judgment.

In addition, an unanswered but interesting question remains as to why the attorneys for Mr. Rodas did not seek a judicial pronouncement terminating treatment. During the relevant period, Mr. Rodas was represented by experienced counsel, and the responsibility to protect his legal rights was equally within their purview.

V.

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

A. *Claims under 42 U.S.C. Section 1983*

Defendants contend that they are entitled to summary judgment. Defendants argue plaintiff's Section 1983 claim fails as a matter of law because (1) defendants' actions are not state actions; (2) an alleged failure to implement state due process remedies does not constitute state action because *all* parties failed to implement the remedies; (3) Mr. Rodas' failure to mitigate damages precludes recovery by his estate; (4) even if the defendants acted under color of state law, they are shielded by the doctrine of qualified immunity; and (5) plaintiff's Section 1983 claim was a compulsory counterclaim in the state court action.

To establish a Section 1983 claim, plaintiff must establish the following elements: (1) an entity acting under color of state law; (2) who subjects or causes to be subjected any person; (3) to the deprivation of any rights; (4) that are secured by the Constitution or laws of the United States.

 We are persuaded defendants have prevailed on their motions for summary judgment on the Section 1983 claim. In our view, plaintiff has failed to prove any state action by the defendants. Plaintiff's First Amended Complaint asserts that the following actions of the defendants constitute "state action": (1) the extensive state regulations governing Hilltop; (2) Hilltop's and Cobb's licensing by the State of Colorado; (3) Hilltop's receipt of compensation through Medicare, Medicaid, and Social Security programs; (4) Hilltop's funding, ben-

efits, and authority from city, county, and state sources; (5) Hilltop's monopoly as a rehabilitation facility in the Grand Junction area; (6) the authority under Colo.Rev.Stat. § 27–10–101, *et seq.* concerning care and treatment of the mentally ill; and (7) Dr. Cobb's actions as Hilltop's representative and agent. First Amended Complaint ¶¶ 21, 22.

Taken individually or in their totality, the alleged actions of the defendants are insufficient to constitute state action. As noted, in order to maintain a civil rights action against a private entity or person, the "conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State". *Lugar v. Edmondson Oil Company, Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). To meet this standard, plaintiff must show there is a sufficiently close nexus between the state and the challenged action of the private entity so that the action of the entity may fairly be treated as that of the state. In *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court held a private school receiving 99% of its funding from the government was not acting under color of state law with respect to the discharge of personnel. Similarly, plaintiff in this action cannot show a sufficiently close nexus between the defendants' actions and the state entity.

Hilltop is a private, nonprofit Colorado corporation. (Hilltop's Memorandum, Exhibit H.) Hilltop receives Medicare and Medicaid fees, and is state licensed and regulated. (Hilltop's Memorandum, Exhibit H.) Dr. Cobb is a private individual; he did not receive any public funds for treating Mr. Rodas. (Cobb's Memorandum, Exhibit B, D, E.) While licensed as a physician by the state, Dr. Cobb does not work directly or indirectly for the state government.

These actions of the defendants are insufficient to support a finding of state action under Section 1983. In *Loh–Seng Yo v. Cibola General Hospital,* 706 F.2d 306 (10th Cir.1983), the plaintiff sued a hospital for civil rights violations. The hospital re-

ceived public funds, was subject to public regulations, and was the only hospital of its type in the region. The court stated:

In this case, plaintiff bases his allegation of state action solely on receipt of governmental funds, extensive governmental regulation, and a localized geographic monopoly enjoyed by the hospital. However, he makes no allegation that these facts involved the state in any significant manner in the *specific conduct* of which he complains. Accordingly plaintiff has failed to establish state action sufficient to invoke the jurisdiction of this court.

706 F.2d at 308. (Emphasis in original.)

Under similar circumstances in *Ward v. St. Anthony Hospital,* 476 F.2d 671 (10th Cir.1973), the Tenth Circuit Court of Appeals found that the district court's grant of summary judgment in favor of the defendant hospital was proper in a case involving denial of hospital privileges to a physician. The court reasoned that the plaintiff must show a causal connection between the state conduct and plaintiff's injury.

In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), a nursing home's decision to discharge or transfer Medicaid patients was not state action, even though the home received state funds, because decisions regarding patient care were not related to funds.

In the case at bar, plaintiff has failed to show *specific conduct* of the defendants that can be considered state action causally connected to plaintiff's injury. Defendant Hilltop's receipt of Medicare and Medicaid funds is insufficient. *Loh–Seng Yo, supra; Ward, supra.* The fact that defendants failed to implement procedures provided by Colo.Rev.Stat. § 27–10–101, *et seq.,* regarding treatment of the mentally ill, is not state regulation sufficient to establish state action. Neither is the availability of the provisions of Colo.Rev.Stat. § 15–14–301, *et seq.,* concerning protection of persons with disabilities. The mere existence of state regulation affecting the defendants does not justify a finding of state action. There must be a showing of specific conduct which is shown to be state action or conduct that may be reasonably equated with state action.

The nexus between the state and Dr. Cobb is even more tenuous than that applicable to Hilltop. Prudential Insurance Company paid the bills sent by Dr. Cobb to Mr. Rodas. By no stretch of the imagination can Dr. Cobb's actions be fairly attributable to the state.

Plaintiff asserts the case of *Rasmussen v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987), supports the proposition that a private health provider's refusal to stop life sustaining treatment can be considered "state action". Thus, the Arizona Supreme Court found that state action was present by virtue of the state's authority to license and regulate hospitals and its supervisory authority over the guardianship of incapacitated persons. *Rasmussen* is contrary to Tenth Circuit law and is not persuasive.

In *In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (N.Y.), *cert. denied sub nom., Storar v. Storar,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981), the New York Supreme Court found that a right to refuse medical treatment existed based solely on common law grounds. The New York Supreme Court specifically deleted all findings of the appellate court in *In re Eichner,* 73 A.D.2d 431, 426 N.Y.S.2d 517 (N.Y.App.Div.1980), except the court's finding authorizing discontinuance of the petitioner's respirator. Thus, the *Eichner* court's finding that state action existed as a result of the state's *parens patriae* responsibility was overruled.

The case of *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983), does not support plaintiff's position. In *Colyer,* the husband of an incompetent patient in a chronic vegetative state sought a court order to discontinue life-sustaining systems. The court determined that if a right to privacy existed based upon the federal constitution and applied to the states through the Fourteenth Amendment, it would extend only to situations where state action exists. The court found that a sufficiently close nexus between the state and the hospital existed due to (1) the capability of imposing crimi-

nal sanctions on the hospital and its staff, (2) state licensing of physicians, (3) the required involvement of the judiciary in the guardianship appointment process, and (4) the state's parens patriae responsibility to supervise the affairs of incompetents. We elect to refrain from following the *Colyer* decision because first, that case improperly relied upon the superseded *Eichner* decision, and secondly, it is in conflict with Tenth Circuit law.

A California case worthy of note is *Bouvia v. Superior Court*, 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986) (*Bouvia I*).[2] In *Bouvia I*, the plaintiff filed suit requesting a temporary injunction for the removal of a nasogastric feeding tube. The tube had been inserted against her will by the medical staff of a nursing facility operated by the County of Los Angeles Department of Health Services. The appellate court directed the trial court to issue an injunction ordering removal of plaintiff's feeding tube and prohibiting its replacement without plaintiff's consent. The proceedings in *Bouvia v. Glenchur*, 195 Cal.App.3d 1075, 241 Cal.Rptr. 239 (1987) (*Bouvia II*), commenced when Bouvia's treating physicians began to reduce the use of morphine in the treatment of her chronic pain after the removal of her nasogastric feeding tube. Bouvia filed a suit for damages and injunctive relief to prohibit the hospital from decreasing her morphine dosage. Two independent physicians appointed by the trial court recommended that Bouvia be transferred to another facility where she could enter a program to reduce her morphine dependence. The trial court issued a temporary injunction that she be returned to the medical center, and rejected her claims for attorney fees under 42 U.S.C. § 1988. The appellate court confirmed the trial court's denial of attorney fees, finding that the "fortuitous fact" that plaintiff was treated in a hospital maintained by the County of Los Angeles was not sufficient to invoke a civil rights violation under Section 1983. Further, Bouvia had failed to

show that her injuries were proximately caused by the execution of a governmental policy or custom. Thus, the evidence failed to establish that the decision to withdraw Bouvia from morphine was made pursuant to any governmental custom, plan, or scheme. We concur with the reasoning in *Bouvia II.*

Thus, in the case at bar, plaintiff's claim under Section 1983 is not supportable. Simply stated, plaintiff cannot establish state action by defendants.

**B. *Claims under the Rehabilitation Act***

Defendants argue plaintiff's claims under the Rehabilitation Act are not legally cognizable. We agree. We have the benefit of the state district court ruling, filings in that case, and pleadings and representations detailed by the parties in this action. Thus, there is ample evidence before us to find and conclude that (1) the Rehabilitation Act does not apply to the type of claim asserted by plaintiff; (2) defendants did not discriminate against Mr. Rodas under the provisions of the Rehabilitation Act; and (3) plaintiff's Rehabilitation Act claims are barred by the principles of collateral estoppel and the doctrine of res judicata.

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 provides in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in section 706(8) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...

In order to state a claim under Section 504, plaintiff must prove that (1) Mr. Rodas was handicapped within the meaning of the Rehabilitation Act; (2) that he was "otherwise qualified" for the position or benefit sought; (3) that he was excluded from the position or benefit solely by reason of his handicap; and (4) that the position or benefit exists as part of a program or activity

---

**2.** We recognize *Bouvia I* and *Bouvia II* to be precedent setting and in the forefront of jurisprudence in this field. *Bouvia I* was one of the initial cases involving removal of a nasogastric

feeding tube at the request of the patient. The right of a mentally competent adult to refuse feeding through a nasogastric feeding tube was delineated.

receiving federal financial assistance. *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1384 (10th Cir.1981); *Doe v. New York University,* 666 F.2d 761, 775 (2nd Cir.1981).

Plaintiff asserts defendants violated the Rehabilitation Act by failing to follow Mr. Rodas' explicit instructions to remove his gastrostomy tube because of their perception that Mr. Rodas was mentally handicapped. Plaintiff further argues defendants discriminated against Mr. Rodas because of his actual physical handicap by failing to obtain court authorization for the unwanted treatment—treatment he was physically unable to refuse.

■ The Rehabilitation Act does not apply to asserted violations of this type. In *School Board of Nassau County, Florida v. Arline,* 480 U.S. ——, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court discussed pertinent provisions of the legislative history of the Rehabilitation Act as follows:

> In enacting and amending the Act, Congress enlisted all programs receiving federal funds in an effort 'to share with handicapped Americans the opportunities for an education, transportation, housing, health care, and jobs that other Americans take for granted'. 123 Cong Rec 13515 (1977) (statement of Sen. Humphrey)

480 U.S. at ——, 107 S.Ct. at 1126, 94 L.Ed.2d at 315. The assertion that the Rehabilitation Act applies to a right to refuse medical treatment in a situation such as this is an extremely expansive view of "health care", a view we have considered and reject.

Plaintiff argues the regulations promulgated under the statute are written broadly and result in the Rehabilitation Act applying to this action. The regulations prohibit a recipient of federal financial assistance from limiting a "qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service". 45 C.F.R. § 84.4(b)(1)(vii).

We have considered and reject plaintiff's argument. Our research fails to disclose precedent for the view that unwanted medical treatment is a violation of the Rehabilitation Act. The most closely analogous case is *United States v. University Hospital, State University of New York,* 729 F.2d 144 (2nd Cir.1984). In *University Hospital,* the parents of a child born with multiple birth defects did not consent to corrective surgical procedures, instead opting for more "conservative" medical treatment. During the pendency of proceedings in state court regarding the parents' decision, the United States Department of Health and Human Services (H.H.S.) received a complaint from an unidentified "private citizen" that Baby Jane Doe was being denied medical treatment on the basis of her handicap. The H.H.S. obtained a copy of the state court proceedings and attempted to inspect Baby Jane Doe's medical records based on its authority to conduct an appropriate investigation under Section 504 of the Rehabilitation Act. The University Hospital refused to release the medical records because of (1) the parents' refusal to release the record, and (2) questions concerning the jurisdiction of the H.H.S. The government brought suit, alleging a violation of Section 504 as a result of the hospital's refusal to allow the H.H.S. access to Baby Jane Doe's medical records. The district court found in favor of the hospital. On appeal, the defendant-appellees argued that "congress did not intend that Section 504 serve as the basis for federal intervention in medical decision-making". 729 F.2d at 149. In a well-reasoned opinion, the Second Circuit analyzed Section 504, its legislative history, and applicable regulations. The appellate court concluded that Section 504 of the Rehabilitation Act did not apply to treatment decisions involving defective newborn infants. Reasoning that the "otherwise qualified" language of the Rehabilitation Act did not apply to a newborn infant suffering from multiple birth defects, the Circuit stated:

> *Doe* establishes that section 504 prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services

in question. As defendants here point out, however, where medical treatment is at issue, it is typically the handicap itself that gives rise to, or at least contributes to, the need for services. Defendants thus argue, and with some force, that the "otherwise qualified" criterion of section 504 cannot be meaningfully applied to a medical treatment decision.

. . . . .

. . . As a result, the phrase [otherwise qualified] cannot be applied in the comparatively fluid context of medical treatment decisions without distorting its plain meaning. In common parlance, one would not ordinarily think of a newborn infant suffering from multiple birth defects as being "otherwise qualified" to have corrective surgery performed or to have a hospital initiate litigation seeking to override a decision against surgery by the infant's parents. If congress intended section 504 to apply in this manner, it chose strange language indeed.

729 F.2d at 156. The Second Circuit further found that the medical treatment decision did not fit within the "subjected to discrimination" language of Section 504. The Circuit Court stated, "[w]here the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory' ". 729 F.2d at 157. The Second Circuit's rationale in *University Hospital* was affirmed by the Supreme Court in *Bowen v. American Hospital Association*, 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (4–1–4 decision).[3]

Although the instant action does not involve medical treatment of handicapped newborn infants, the reasoning used in *University Hospital* applies here. In our view, the Rehabilitation Act does not apply to the medical treatment decisions of a physically handicapped individual, of questionable mental competency, who requests his treating physician and hospital to terminate medical treatment. The application of the "otherwise qualified" requirement of

Section 504 does not square with the facts in this case. Mr. Rodas was admitted to Hilltop for the purpose of obtaining medical treatment for his physical and medical handicap; the defendants' decisions on Mr. Rodas' request to terminate gastrostomy feedings were interwoven with their medical decisions regarding Mr. Rodas' treatment. Thus, in these circumstances, Section 504 of the Rehabilitation Act is inapplicable. *See also Sabo v. O'Bannon*, 586 F.Supp. 1132 (E.D.Pa.1984) (No cause of action exists under Section 504 where the gravamen of the complaint asserts a violation of the Act by denying a mentally retarded individual placement in a residential, non-institutional facility.)

■ Even assuming that the Rehabilitation Act applies to the types of rights alleged to have been violated by defendants, a further basis exists for our grant of summary judgment. Plaintiff has failed to show as a genuine issue of material fact that defendants discriminated against Mr. Rodas. Plaintiff has not shown any instance where defendants treated Mr. Rodas differently from any other individual under their care, nor has plaintiff shown that defendants would have treated a "competent patient" differently. In fact, Dr. Cobb's rationale for treating Mr. Rodas was his fear that if Mr. Rodas "were competent, then I would be assisting in a suicide, which is manslaughter, and if he were incompetent, then I would be doing the deed myself, manslaughter, second degree murder". (Cobb Depo. p. 49.) Dr. Cobb's professional decision to continue treatment of Mr. Rodas does not establish discrimination against the handicapped. In fact, from the record one can clearly see that the course of conduct by Dr. Cobb was sensitive, caring, and professional. The perplexing medical and ethical issues facing Dr. Cobb are well stated in his deposition:

Q Is there some reason that you didn't go into court, or the hospital, to your knowledge, didn't go into court and

---

**3.** The *Bowen* decision invalidated regulations promulgated by the Department of Health and Human Services regarding procedures relating to health care for handicapped infants.

ask the judge to make that legal decision at that time?

A There were discussions all along between the attorneys as far as the appropriate way to proceed. As I've eluded (sic) to already, who was required to do the action in this, what the action is, was totally unclear. We were feeling our way along in a damn complicated case, involving life or death, with me in the driver's seat.

(Cobb Depo. p. 50.)

Although Mr. Rodas ultimately prevailed in his decision to forego medical treatment, and was found to have the mental capacity to refuse treatment, defendants' actions can hardly be considered discriminatory due to any mental or physical handicap of Mr. Rodas. The state court held a lengthy trial, and issued a thirty-eight page opinion covering many issues, including that of Mr. Rodas' mental competency. This is an indication of how strongly the parties contested Mr. Rodas' mental capacity. The defendants' doubts about Mr. Rodas' capacity were reasonable. This does not constitute discriminatory treatment under the Rehabilitation Act. The decision to continue treatment was a judgment call and a decision of life and death consequences.

Plaintiff next argues that but for Mr. Rodas' "inability to physically refuse unauthorized medical treatment", defendants would have taken fewer than 66 days to seek a court ruling on his treatment. This assertion must also fail. Mr. Rodas had retained legal counsel and could have refused treatment or initiated the state court action through counsel. Mr. Rodas also had relatives who could have taken the necessary steps. In addition, when mental capacity is questionable, a delay of 66 days in determining a life and death matter on an issue of first impression in the Colorado courts is not unreasonable.

Plaintiff contends that the testimony of Sally Schaefer supports the contention that defendants discriminated against Mr. Rodas due to his physical handicap. Sally Schaefer testified in her deposition that if Mr. Rodas had not been so physically disabled, Hilltop would have considered involuntarily committing him under the procedures proscribed by the Colorado Care and Treatment of the Mentally Ill Act, Colo. Rev.Stat. § 27–10–101, et seq. (Schaefer Depo. pp. 17–21.) This testimony does not prove plaintiff's point. Schaefer testified that Hilltop would have considered involuntary commitment procedures because Mr. Rodas would have been a danger to himself if he had the physical capacity to move. Since he could not move, he presented no physical danger to himself or others. Therefore, the availability of commitment procedures is no indication that defendants' failure to file suit earlier was discrimination based upon a physical handicap.

Finally, defendants argue plaintiff's Rehabilitation Act claims are barred by the principles of collateral estoppel and res judicata. We agree with this contention. The doctrine of collateral estoppel (claim preclusion) requires: (1) the issue must be identical to an issue actually and necessarily decided at the prior proceedings; (2) a final judgment on the merits of the first proceeding; (3) identity or privity of parties against whom the doctrine is asserted; and (4) the party against whom the doctrine is claimed must have had a full and fair opportunity to litigate the issue in the prior proceeding. *In the Matter of Lombard,* 739 F.2d 499, 502 (10th Cir.1984); *People ex rel. Gallagher v. District Court,* 666 P.2d 550, 554 (Colo.1983).

■ The requirements of collateral estoppel are met by the issues involved and decided in the prior state court proceedings. First, the issues in this case are identical to an issue previously decided. Mr. Rodas' amended response in the state court action states:

4. Additionally, the actions of petitioners in refusing to honor the request to withhold further treatment to said Hector O. Rodas demonstrates that petitioners are failing to provide Mr. Rodas with free choice, rights of privacy, and rights of personal bodily integrity that would be provided if Mr. Rodas were not physically handicapped and unable to effect his choice himself.

5. The acts of petitioners in seeking to foreclose Mr. Rodas from exercising his constitutionally protected and individual choice to refuse treatment at his current location in Hilltop Rehabilitation Hospital constitute a direct infringement and deprivation of his rights. As such, the actions of petitioners constitute violation of rights guarantied to Mr. Rodas under the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978; Title V, Section 504; 29 U.S.C. § 794.

(Rodas' First Amended Response, Exhibit D to Hilltop's Memorandum.) These assertions are almost identical to paragraphs 28 through 36 of the First Amended Complaint.

Second, the state court issued a final judgment on the merits of the Rehabilitation Act claim. The state court specifically found: "Hector Rodas' claims made under 29 U.S.C. Sec. 794 are denied and dismissed". *In the matter of Hector O. Rodas,* No. 86 PR 139, slip op. at 38 (Colo. Dis.Ct. April 3, 1987). The state court further found:

Mr. Rodas claims that since requesting termination of feeding treatment on June 17, 1986, he has been discriminated against and that by that discrimination, Hilltop has violated and will continue to violate the Federal Rehabilitation Act, 29 U.S.C. Sec. 794. Although that act may give Mr. Rodas a right to a private claim, Mr. Rodas has failed to meet his burden of proof that he has been or will be discriminated against or that there has been or will be a violation of that act by Hilltop in the manner in which they provided or did not provide treatment or will treat Mr. Rodas. This claim should be denied.

*Id.* at 35. Third, the parties are identical or in privity with the parties in the state suit.

The only substantial question is whether the fourth element of collateral estoppel is present, whether plaintiff had a full and fair opportunity to litigate the Rehabilitation Act claims in the prior proceeding. Plaintiff argues Mr. Rodas did not have an adequate opportunity for a full and fair

adjudication in the state court because of the limited nature of the proceedings. Plaintiff argues *Rodas I* was initiated by defendants to (1) obtain a guardian for Mr. Rodas, and (2) for declaratory relief that Mr. Rodas did not have the right to terminate life-supporting medical treatment, and that defendants could not be required to discontinue treatment. Plaintiff further asserts the Rehabilitation Act claims were raised only in the form of an affirmative defense; Mr. Rodas did not seek damages under the statute. Instead, the court and the parties treated the action as a probate action.

We disagree with the contentions. Plaintiff had a full and fair opportunity to raise any issues raised by the Rehabilitation Act. The state court held a lengthy trial and heard the testimony of numerous witnesses. We are impressed by the quality, thoroughness, and fairness of procedures followed in the prior litigation. *Montana v. United States,* 440 U.S. 147, 164 n. 11, 99 S.Ct. 970, 979 n. 11, 59 L.Ed.2d 210 (1979). The requisites of collateral estoppel have been met.

■ We further find the doctrine of res judicata is applicable. The doctrine of res judicata requires: (a) identity of the subject matter; (b) identity of the cause of action; (c) identity of the parties; and (d) identity of capacity in the persons for which or against whom the claim is made. *City of Westminster v. Church,* 167 Colo. 1, 445 P.2d 52, 55 (1968); *Miller v. Lunnon,* 703 P.2d 640, 643 (Colo.App.1985).

Plaintiff asserts res judicata does not apply because Mr. Rodas was not allowed to present evidence relating to the Rehabilitation Act. Instead, Mr. Rodas' evidence focused on his mental competency to make his own medical decisions. Plaintiff's arguments are not persuasive. The subject matter of Mr. Rodas' state court Rehabilitation Act contentions is identical to the claims raised by plaintiff's First Amended Complaint—whether defendants' conduct violated the Rehabilitation Act. Mr. Rodas was a party in the state court action; his estate is a party in this action. The fact that he was a respondent in the state court

and his estate is a plaintiff in this action satisfies the requirement of identity of parties. Therefore, the requirements of res judicata are met.

Plaintiff argues defendants are inconsistent in requesting partial summary judgment in their favor, and also asserting genuine issues of material fact exist preventing the grant of summary judgment in favor of plaintiff. We disagree. Plaintiff's motion for summary judgment must be denied, as discussed previously, because she requests a definitive ruling as to a physician's responsibility to a competent patient who requests cessation of medical treatment. As to plaintiff's motion, genuine issues of material fact exist as to Mr. Rodas' mental capacity. To the contrary, defendants' motions involve purely legal issues, i.e., that plaintiff failed to establish state action under Section 1983, and that plaintiff's Rehabilitation Act claims are not cognizable under applicable law.

## CONCLUSION

Putting aside the legal jargon and the technicalities of the applicable statutes, we find that plaintiff is not entitled to prevail. Defendants acted reasonably and even admirably, in an exceedingly difficult situation. To summarize the important aspects of the case, Mr. Rodas, who was unable to move and who could communicate only with great difficulty, requested that his medical treatment cease. Hilltop is a rehabilitation center with the goal of prolonging life and encouraging rehabilitation. Dr. Cobb's ethical beliefs suggested that following Mr. Rodas' request would be either assisting suicide or second degree murder. Mr. Rodas had in the past attempted suicide and expressed suicidal inclinations. Psychological evaluations as to the mental capacity of Mr. Rodas were conflicting. At least one evaluation stated he suffered from a mental illness and depression. Mr. Rodas was under much stress at the time of his request. His wife had filed for divorce. The Immigration and Naturalization Service was threatening him with deportation proceedings. Mr. Rodas had only recently suffered a severe injury resulting in paralysis from the neck down, requiring feeding through a gastrostomy tube. Mr. Rodas' sister, Yazmin Griego, had threatened a civil suit against Hilltop and Dr. Cobb if medical treatment was terminated. Other previous Hilltop patients had expressed grief and frustration and indicated a preference to die, but all had subsequently changed their minds.

Under these circumstances, Hilltop and Dr. Cobb attempted to obtain legal representation for Mr. Rodas. Their actions were above reproach and as noted, were marked with sensitivity, care, and a high degree of professional responsibility.

Accordingly, IT IS ORDERED that the motions for summary judgment filed by defendants Hilltop Rehabilitation Hospital and William Cobb, M.D. are GRANTED. The Clerk of the Court is DIRECTED to enter summary judgment in favor of the defendants and against the plaintiff.

Plaintiff's motion for summary judgment is DENIED. The Clerk of the Court is directed to enter appropriate Judgment dismissing the amended complaint and cause of action.

The parties' motions for attorney fees are held in abeyance. The parties are DIRECTED to file any motions for attorney fees and briefs in support of the motions by January 22, 1988. All responses shall be filed by February 2, 1988.

## APPENDIX

The right to refuse medical treatment is an area of emerging jurisprudence. In this Appendix we briefly summarize several important decisions and list important treatises on the right to refuse medical treatment issue. Cases discussed in the text of the opinion are not included herein.

### A. Leading Decisions

*In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), involved a comatose 21 year old woman, in a chronic and persistent vegetative state. The New Jersey Supreme Court appointed Quinlan's father as her guardian. The court held that Quinlan had a right to privacy which included the

right to terminate her noncognitive, vegetative existence. Further, her right to privacy could be exercised on her behalf by her guardian.

In *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977), the Supreme Judicial Court of Massachusetts affirmed the Probate Court's decision to deny chemotherapy treatment to a 67 year old profoundly retarded man who had developed a fatal form of leukemia. The "substituted judgment doctrine" was applied in determining whether to give medical treatment. The substituted judgment doctrine considers what decision would be made regarding treatment if the incompetent person were actually competent. One of the factors to be considered is the present and future incompetency of the patient.

*Severns v. Wilmington Medical Center, Inc.*, 421 A.2d 1334 (Del.1980) and *In re Severns*, 425 A.2d 156 (Del.Ch.1980), granted the guardian of a 55 year old woman in a permanently comatose state, the authority to discontinue all medical treatment, including a nasogastric tube.

An individual who was terminally ill, and in a permanent vegetative state was held to have a constitutional right of privacy to decline medical treatment in *Leach v. Akron General Medical Center*, 68 Ohio Misc. 1, 426 N.E.2d 809 (1980). Further, the patient's guardian was permitted to direct discontinuance of a respirator on the patient's behalf when clear and convincing evidence existed that the individual would refuse treatment.

*In the Matter of Lydia E. Hall Hospital*, 116 Misc.2d 477, 455 N.Y.S.2d 706 (N.Y. App.Div.1982), determined that the decision to forego dialysis treatment by a terminally ill renal disease patient would be honored, even though the patient had become comatose. In this case, the patient had made an informed, rational and knowing decision to forego treatment prior to becoming comatose.

The Florida Supreme Court ruled that it was not necessary to obtain the approval of a court-appointed guardian before terminating extraordinary life support systems of a terminally ill individual who had executed a "living will". The family and attending physicians and hospital would be relieved of civil and criminal liability even though the guardian's approval was not obtained. *John F. Kennedy Hospital v. Bludworth*, 452 So.2d 921 (Fla.1984).

*Delio v. Westchester County Medical Center*, 129 A.D.2d 1, 516 N.Y.S.2d 677 (N.Y.App.Div.1987), found by clear and convincing evidence that Delio had made a solemn and intelligent decision while competent that he would refuse to be maintained in a chronic vegetative state with nutrition and hydration tubes. Further, there was no compelling countervailing state interest to override Delio's common-law right to refuse treatment. Thus, exercise of that right would be honored.

In *In the Matter of Farrell*, 108 N.J. 335, 529 A.2d 404 (1987), the New Jersey Supreme Court found that a competent, terminally ill adult patient living at home had the right to choose to have her life-supporting treatment by respirator disconnected.

A 74 year old incompetent woman was held to have a constitutional right to privacy and right to refuse life prolonging procedures in *In the Matter of Beth Israel Medical Center*, 136 Misc.2d 931, 519 N.Y. S.2d 511 (N.Y.Sup.Ct.1987). The New York County Supreme Court considered the patient's condition, her limited life expectancy, and risk of not surviving surgery, and refused to order emergency surgery, even though she would die from gangrene if the operation were not performed.

*In re Gardner*, 534 A.2d 947 (Me.1987), involved an individual who was in a persistent vegetative state, but had made a preaccident determination to permit the discontinuation of life-sustaining procedures. The Maine Supreme Court held that the individual's guardian could require compliance with the patient's preaccident determination.

### B. Treatises

The following treatises outline important recent developments in the legal and medical areas:

1. Alexander M. Capron, *Right to Refuse Medical Care*, in Encyclopedia of Bioethics, Vol. I, pp. 1498–1507 (1978).

2. David J. Sharpe, Salvatore F. Fiscina, and Murdock Head, *Cases and Materials on Law and Medicine* (1978).

3. Walter Wadlington, Jon Waltz, and Roger Dworkin, *Cases and Materials on Law and Medicine* (1980).

4. David W. Meyers, *Medico and Legal Implications of Death and Dying* (1981).

5. Shapiro and Spece, *Problems, Cases and Materials on Bioethics and Law* (1981).

6. William J. Curran and E. Donald Shapiro, *Law, Medicine and Forensic Science* (3rd ed. 1982).

7. Salvatore F. Fiscina, *Medical Law for the Attending Physician* (1982).

8. Samuel Gorovitz, *Doctors' Dilemmas: Moral Conflict and Medical Care* (1982).

9. *Legal and Ethical Aspects of Treating Critically and Terminally Ill Patients,* (A. Doudera and J. Peters eds. 1982).

10. President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (President's Commission), *Making Health Care Decisions: The Ethical and Legal Implications of Informed Consent in the Patient–Practitioner Relationship,* U.S. Government Printing Office (1982).

11. President's Commission, *Deciding to Forego Life–Sustaining Treatment: Ethical, Medical and Legal Issues in Treatment Decisions,* U.S. Government Printing Office (1983).

12. John A. Robertson, *The Rights of the Critically Ill,* an American Civil Liberties Union Handbook (1983).

13. Judith Areen, Patricia King, et al., *Law, Science and Medicine* (1984).

14. Charles W. Lidz, Alan Meisel, et al., *Informed Consent: A Study of Decision-making in Psychiatry* (1984).

15. *By No Extraordinary Means: The Choice to Forgo Life–Sustaining Food and Water* (J. Lynne, M.D. ed. 1986).

16. Concern for the Dying, an Educational Council, *The Living Will and Other Advance Directories: A Legal Guide to Medical Treatment Decisions* (1986).

17. Fay A. Rozovsky, *Consent to Treatment: A Practical Guide* (1984 & Supp. 1986).

18. Furrow, Johnson, Jost and Schwartz, *Health Law: Cases, Materials and Problems* (1987).

19. The Hastings Center, *Guidelines on the Termination of Life–Sustaining Treatment and the Care of the Dying* (1987).

20. *Health Care Ethics: A Guide for Decision Makers,* (G. Anderson and V. Anderson eds. 1987).

21. American College of Legal Medicine, *Legal Medicine: Legal Dynamics of Medical Encounters* (in press).

C. Annotations

The following American Law Reports annotations provide case digests and summaries of decisions on the right to refuse medical treatment issue.

1. Karnezis, *Power of Court to Order or Authorize Discontinuation of Extraordinary Medical Means of Sustaining Human Life,* 79 A.L.R.3d 237 (1977).

2. Karnezis, *Patient's Right to Refuse Treatment Allegedly Necessary to Sustain Life,* 93 A.L.R.3d 67 (1979).

3. Hodson, *Judicial Power to Order Discontinuance of Life–Sustaining Treatment,* 48 A.L.R.4th 67 (1986).