OPINION OF THE COURT
John P. DiBlasi, J.
In what appears to be a matter of first impression, the court is asked to determine an issue involving the relationship between Mental Hygiene Law articles 81 and 33. Specifically, the court must decide whether an individual for whom a guardian has been appointed nevertheless retains the right to seek a hearing to challenge an effort to medicate her over her objection. Based upon the reasoning which follows, the court concludes that the guardian appointed pursuant to Mental Hygiene Law article 81 may not waive such a hearing over the objection of the incapacitated individual.
FACTUAL BACKGROUND
The patient J.H.L.[1] is a 48-year-old woman who has been diagnosed as suffering from schizophrenia. On April 1, 1999 she was hospitalized at New York Presbyterian Hospital (the Hospital) pursuant to Mental Hygiene Law § 9.27. Previously, J.H.L. has been hospitalized three times between 1994 and 1996. It is alleged by the Hospital that each of J.H.L.’s “hospitalizations have been due primarily to non-compliance with medication and lack of follow-up in the community, resulting in decompensation evidenced by paranoid delusions, pres *144 sured and rapid speech, agitation and loosening of associations” (petitioner’s brief, at l).[2]
In February 1996, J.H.L.’s brother, F.L., commenced a proceeding in Supreme Court of the State of New York, County of Nassau, seeking the appointment of a guardian for J.H.L. pursuant to Mental Hygiene Law article 81. Justice Frank S. Rossetti appointed a court evaluator and subsequently conducted a hearing. After considering the evidence presented and the court evaluator’s recommendation,[3] Justice Rossetti rendered an order and judgment dated April 15, 1996 (the 1996 Order).
As set forth in the 1996 Order, Justice Rossetti found that J.H.L. “is not able to provide for her personal needs and property management, and is incapacitated as defined under section 81.02 of the Mental Hygiene Law” (petitioner’s exhibit A, order and judgment, Apr. 15, 1996, at 2). Based upon that finding, which the court stated was supported by clear and convincing evidence, F.L. was appointed guardian for the personal needs and property management of J.H.L. (id., at 2-3). Among the powers granted to the guardian was the power “to consent to or refuse generally accepted routine or major medical or dental treatment” (id., at 5). Nevertheless, in the exercise of that and all other powers granted to him, F.L. was directed to: “afford [J.H.L.] the greatest amount of independence and self determination with respect to such needs and property in light of said incapacitated person’s functional level, understanding and appreciation of her functional limitations, and personal wishes, preferences and desires with regard to managing the activities of daily living.” (Id., at 4.) It appears that no appeal was taken from the 1996 Order, and that, to date, it remains in effect.
Shortly after J.H.L.’s April 1st admission to the Hospital, a question arose as to F.L.’s authority to consent to the treatment of J.H.L. over her objection. It appears that upon the advice of counsel for the Hospital, F.L. wrote a letter to Justice Rossetti seeking an amendment to the 1996 Order which would *145 more clearly set forth his powers with respect to consenting to treatment. On April 15, 1999 Justice Rossetti issued an Amended Order (the Amended Order) which added the following language to the 1996 Order:
“The Guardian’s power to consent to or refuse major medical treatment shall be deemed to include the power to consent to or refuse the administration of anti-psychotic or other psychiatric medications or treatment, including but not limited to anti-depressants, mood stabilizers or related medications, or electro-shock therapy, and it is further
“ordered, that any such consent of the Guardian for said major medical treatment shall constitute a legally valid consent to such treatment in the same manner and to the same extent as if the incapacitated person were able to consent to or refuse such treatment on her own behalf.” (Petitioner’s exhibit B.)
The Hospital does not deny that the Amended Order was based upon an ex parte application. Nevertheless, it appears that no action was taken by J.H.L. or anyone acting in her behalf to seek vacatur or modification of that ex parte order.
Because the Hospital sought a resolution of the issue of J.H.L.’s refusal to receive medication following her recent admission, it commenced a proceeding under Mental Hygiene Law article 33 and 14 NYCRR 527.8. On the return date of the order to show cause commencing that proceeding, this court and counsel for the Hospital and J.H.L. discussed the question of whether F.L. was authorized to waive a hearing on the forced medication request. Based upon that discussion, the court granted the parties the opportunity to submit written briefs and present oral argument on May 12, 1999. Having considered the written and oral presentations of the parties, the court now addresses the issues involved in this matter.
INTERPLAY OF MENTAL HYGIENE LAW ARTICLES 33 AND 81
At the core of the parties’ dispute is what impact the 1996 Order and the Amended Order have upon J.H.L.’s right to a hearing on the issue of the proposed treatment plan. It is her position that as a matter of law, notwithstanding the 1996 finding that she was incapable of caring for her personal needs, F.L. does not have the authority to consent to the proposed treatment over her objection and to waive her hearing rights.
“It is a firmly established principle of the common law of New York that every individual ‘of adult years and sound mind has a right to determine what shall be done with his own body’ [citation omitted] and to control the course of his medical *146 treatment” (Rivers v Katz, 67 NY2d 485, 492 [1986], quoting Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129 [1914]). This protection inheres “[i]n our system of a free government, where notions of individual autonomy and free choice are cherished, [so that] it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires” (Rivers v Katz, supra, 67 NY2d, at 493).
The right of an individual to refuse a proposed course of treatment, including the forcible administration of psychotropic medications, as is sought at bar by the Hospital, is one of State constitutional dimension, as it involves the recognized right to privacy (see, Rivers v Katz, supra). Indeed, it is a right so significant that it extends to individuals who are mentally ill, even when they have been involuntarily committed to a psychiatric facility (supra, at 494). Because there is no presumption that such individuals are incompetent to make determinations about proposed treatment plans, they are entitled to a judicial determination (Rivers hearing) as to the propriety of being compelled to take medication over their objection (supra, at 496). In the case before this court, J.H.L. relies upon that right to challenge the attempt by F.L. to waive her entitlement to a Rivers hearing.
While recognizing the breadth of its holding, the Hospital argues that Rivers (supra) does not require a hearing in this case. In offering that position, the Hospital relies upon the language in Rivers which speaks in terms of the right to refuse treatment possessed by one who is not incompetent. As viewed by the Hospital, since the 1996 Order adjudicated J.H.L. an incapacitated person who is not able to provide for her personal needs, she is incompetent as a matter of law, and does not have a right to a Rivers hearing. While proffering this argument, the Hospital concedes that Rivers requires a hearing at which it must be established by clear and convincing evidence that, inter alia, “the patient lacks the capacity to determine the course of his own treatment” (Rivers v Katz, supra at 497), and a judicial determination of that issue. Nevertheless, the Hospital maintains that such due process considerations were fully satisfied at the article 81 hearing conducted by Justice Rossetti, at which the same strict burden of proof applied, and following which the issue of J.H.L.’s incapacity was decided by that Court. This court cannot agree with the Hospital’s position.
*147 Mental Hygiene Law article 81 establishes procedures for the appointment of guardians for the personal needs or management of property of incapacitated persons. Under article 81, the alleged incapacitated person has the right to counsel (Mental Hygiene Law § 81.10) and must be served with a petition setting forth, inter alia, the allegations concerning his functional level to manage his daily activities and the powers sought to be granted to the guardian (Mental Hygiene Law § 81.08). In addition, the court must appoint an evaluator, who acts as an independent investigator to obtain information helpful to the court in reaching its determination (Mental Hygiene Law § 81.09). Underpinning the entire procedure is a requirement that a hearing be conducted at which witnesses are called and evidence presented (Mental Hygiene Law § 81.11), and at which the petitioner must prove, by clear and convincing evidence, that the person who is the subject of the proceeding is, in fact, incapacitated (Mental Hygiene Law § 81.12). As is apparent from a review of the article 81 procedures, they do provide an individual with the procedural protections required under Rivers (supra) in the case of a person who objects to a proposed treatment plan.
Counterbalancing these considerations are those related to the manner in which a guardian’s powers are to be exercised and the significant nature of the right to object to a proposed form of treatment. A review of these other factors supports the position taken by J.H.L. in this matter.
As a starting point, the court looks to the Legislature’s expressed intent in creating the article 81 procedures. In particular, it is stated that: “The legislature hereby finds that the needs of persons with incapacities are as diverse and complex as they are unique to the individual. The current system of conservatorship and committee does not provide the necessary flexibility to meet these needs. Conservatorship which traditionally compromises a person’s rights only with respect to property frequently is insufficient to provide necessary relief. On the other hand, a committee, with its judicial finding of incompetence and the accompanying stigma and loss of civil rights, traditionally involves a deprivation that is often excessive and unnecessary. Moreover, certain persons require some form of assistance in meeting their personal and property management needs but do not require either of these drastic remedies. The legislature finds that it is desirable for and beneficial to persons with incapacities to make available to them the least restrictive form of intervention which assists them in *148 meeting their needs but, at the same time, permits them to exercise the independence and self-determination of which they are capable. The legislature declares that it is the purpose of this act to promote the public welfare by establishing a guardianship system which is appropriate to satisfy either personal or property management needs of an incapacitated person in a manner tailored to the individual needs of that person, which takes in account the personal wishes, preferences and desires of the person, and which affords the person the greatest amount of independence and self-determination and participation in all the decisions affecting such person’s life.” (Mental Hygiene Law § 81.01 [emphasis supplied].) To effect this legislative intent, courts may grant various powers to a guardian which are “[c]onsistent with the functional limitations of the incapacitated person, that person’s understanding and appreciation of the harm that he or she is likely to suffer as the result of the inability to provide for personal needs, and that person’s personal wishes, preferences, and desires with regard to managing the activities of daily living” (Mental Hygiene Law § 81.22 [a]).
Our Legislature’s acknowledgment of the importance of considering the incapacitated individual’s wishes, preferences and desires when a guardian exercises his powers provides strong support for the conclusion that an article 81 incapacity adjudication does not authorize a guardian to waive the right to a Rivers hearing over the objection of the incapacitated person. As the court concluded in Matter of Farbstein (163 Misc 2d 26, 29 [Sup Ct, NY County 1994]), “given the emphasis in article 81 on protecting the rights of incapacitated persons, and its language directing a guardian to act with deference to the wishes of the [incapacitated person] [citations omitted], any protections given the mentally ill by the provisions of [Mental Hygiene Law] article 9 should not be avoided by the appointment of a guardian.”
Also consistent with the Legislature’s concerns about the undue impairment of the civil rights of incapacitated persons is its specific treatment of the power of a guardian to commit such an individual. In this regard, Mental Hygiene Law § 81.22 (b) (1) bars a guardian, inter alia, from “consenting] to the voluntary formal or informal admission of the incapacitated person to a mental hygiene facility under [Mental Hygiene Law] article nine”. This limitation clearly reflects the legislative concern that in a matter involving the right of an individual, even one who has been found to be incapacitated, to be *149 free from serious restrictions on his freedom and his privacy rights, a decision of that magnitude should not be made without the consent of the incapacitated person or a judicial determination that such hospitalization is required. Certainly, the same concern is involved where, despite the objection of the incapacitated individual, a medical provider seeks to forcibly treat that individual with antipsychotic drugs which are known to cause numerous serious and, in certain instances, irreversible side effects (see, Rivers v Katz, supra, 67 NY2d, at 490, n l).[4]
Most significantly, given the constitutional foundation upon which rests the right to refuse medical treatment, the court cannot agree with the Hospital that an individual can lose her right to a Rivers hearing based upon a finding of incapacity at an article 81 proceeding. While the Hospital argues that such a finding resolves the issue of the person’s ability to render a reasoned choice as to proposed treatment for as long as the order of incapacity continues, the court does not agree. The case at bar provides a clear example of why such a conclusion is unwarranted.
In this case, J.H.L. was adjudicated incapacitated three years prior to the current application for forced medical treatment. It is undisputed that in that time there has been no further judicial review of her mental status. Consequently, while she had repeatedly expressed her objection to such treatment on other occasions prior to the article 81 hearing, no determination has been made in the intervening three years as to whether she is capable of rendering such a decision.
Even in the context of Rivers hearings conducted under Mental Hygiene Law article 33, the finding that a mentally ill person is unable to make a reasoned decision as to the proposed treatment does not constitute a determination binding in futuro. Rather, as the Hospital concedes, when a subsequent proposal for treatment is presented to a mentally ill person and is objected to, another hearing pursuant to article 33 is required. Thus, under the Mental Hygiene Law there is recognition of the potential for change in the mental status of a person found to be incapable of deciding a medical treatment *150 issue for himself. If this court were to accept the Hospital’s position, J.H.L. would be deprived of the right to have such future review of proposed treatments, unless she or someone else instituted and prevailed upon an application to have it determined that she is no longer incapacitated. In this court’s view, such a requirement would constitute a violation of her right to determine the course of her medical treatment (see, Rivers v Katz, supra, 67 NY2d, at 493).
Other courts have similarly concluded that article 81 cannot deprive an individual of this “paramount” right. Thus, in Matter of Gordon (162 Misc 2d 697 [Sup Ct, Rockland County 1994]) and Matter of Shari K. (177 Misc 2d 25 [Sup Ct, Rock-land County 1998]), Justice Weiner held that an article 81 proceeding could not be employed as a means of obtaining authority with unlimited duration to consent to forcible psychiatric medication for an individual alleged to be incapacitated. As the court stated in Matter of Shari K. (177 Misc 2d, at 27), the granting of such relief “would deprive [the person] of the due process rights and requisite judicial review mandated by Rivers v Katz”. Similarly, in Matter of Farbstein (supra), in the context of an article 81 proceeding, the court denied an application for the guardian to hospitalize an incapacitated person for the limited purpose of having her evaluated as to the administration of psychiatric medication. Like the court in Gordon and Shari K, the Farbstein court determined that such relief could not be obtained under article 81, but instead would have to be sought under Mental Hygiene Law article 9.[5]
This court agrees with the courts in Gordon, Shari K. and Farbstein (supra) that no support for the position espoused by the Hospital at bar can be found in the language of either Mental Hygiene Law article 33 or 81. Certainly, the deprivation of a fundamental right must not be permitted where the applicable procedural statutes are entirely silent on their effect as to such right (see, Matter of Gordon, supra, 162 Misc 2d, at 699 [court found “(n)othing in the legislative history or text of Mental Hygiene Law article 81 (that) implies that the court has the authority to grant the powers requested by the petitioner, in denial of the person’s fundamentally protected liberties”]; see also, Matter of Farbstein, supra, 163 Misc 2d, at 29).'
*151 Finally, in reaching this determination, the court rejects the argument inherent in the Hospital’s position to the effect that the granting of a Rivers hearing to J.H.L. would undermine or render ineffective the decision reached by Justice Rossetti following the hearing in 1996. By recognizing the incapacitated person’s continued right to privacy this court is not granting her “veto” power over the recommendation of the Hospital or the authority of the guardian. Rather, this court’s decision merely acknowledges that J.H.L. has the right to have her objection to the proposed treatment determined judicially, consistent with the significance of that right (see, Rivers v Katz, supra, 67 NY2d, at 496). This ruling does not deprive the Hospital of the right to challenge J.H.L.’s objection at a hearing, nor does it diminish the guardian’s power to offer his own consent to the extent that it exists, and even to advocate in favor of the forced treatment.
In view of this analysis, the court agrees with J.H.L. that the article 81 finding that she is an incapacitated person does not, as a matter of law, deprive her of the right to a hearing on the issue of whether she should be forcibly medicated by the Hospital.[6] Nevertheless, whether she may have a hearing in this case turns upon a consideration of the impact of the 1996 Order and the Amended Order.
THE BINDING EFFECT OF THE PRIOR ORDERS
As a claim preliminary to the core issue in this proceeding, J.H.L. asserted that the language contained in the Amended Order does not grant F.L. the authority to consent to the proposed treatment over her objection. Although the Hospital does not address this claim in its brief, the court rejects this argument as unsupported by the Amended Order.
*152 J.H.L.’s position starts with her proposition that Justice Rossetti is surely “aware of the vital importance of the constitutional right to refuse medical treatment and the case law on this issue” (respondent’s brief, at 6). Building on that premise, she contends that “[i]f Justice Rossetti had intended to grant to [F.L.] the power to override [J.H.L.’s] known objection to medication it is difficult to fathom why he would not have used language in his amended order that expresses the very consequence this order purportedly intended to bring about” {ibid.). Finally, relying upon the language of the Amended Order, she maintains that, in fact, it does not specifically state that F.L. may consent to the types of treatment proposed by the Hospital in the face of her objection to such treatment. Upon that foundation, she argues that the Amended Order does not have the effect of depriving her of the right to a Rivers hearing. This argument is not persuasive.
As noted above, following the article 81 hearing in 1996, Justice Rossetti issued the 1996 Order which granted F.L. the power “to consent to or refuse generally accepted routine or major medical or dental treatment” (petitioner’s exhibit A, order and judgment, Apr. 15, 1996, at 5). Mental Hygiene Law § 81.03 (i) defines “major medical or dental treatment” to include “a medical * * * or diagnostic intervention or procedure * * * which involves the administration of psychotropic medication or electroconvulsive therapy”. Thus, by virtue of the 1996 Order, F.L. was granted the power to consent to the type of treatment sought to be administered to J.H.L. by the Hospital, without reference in that order to any other rights that J.H.L. might possess.
Apparently out of concern as to the Hospital’s authority to administer medication to J.H.L. over her objection, F.L., acting either on his own or at the request or suggestion of the Hospital, wrote a letter to Justice Rossetti, a copy of which has not been provided to this court. Based upon that letter, Justice Rossetti issued the Amended Order which, as set forth above, provided, in part, that F.L.’s “power to consent to or refuse major medical treatment * * * shall constitute a legally valid consent to such treatment in the same manner and to the same extent as if the incapacitated person were able to consent to or refuse such treatment on her own behalf’ (petitioner’s exhibit B, at 2 [emphasis added]).
Since it should not be presumed that a court would render an order which has no effect other than to repeat the terms of a prior mandate, this court must conclude that the Amended *153 Order was entered to make plain that if J.H.L. retained any rights under Mental Hygiene Law article 33 to object to treatment and seek a hearing, such rights were granted exclusively to F.L. to exercise or waive. If the Amended Order is one which this court must follow, then F.L.’s stated intent to waive a Rivers hearing must be given full effect.
In this case, the court does not find that such effect must be accorded to the Amended Order. Since the Amended Order was issued as part of the Mental Hygiene Law article 81 proceeding, and not as part of the present Mental Hygiene Law article 33 proceeding, it does not constitute the law of the case (see, Matter of McGrath v Gold, 36 NY2d 406, 413 [1975] [law of the case doctrine “applies to various stages of the same litigation and not to different litigations”]). Nor is the doctrine of res judicata implicated, since the “claim” involved in this proceeding is not the same as that determined in the article 81 proceeding (see generally, Matter of Reilly v Reid, 45 NY2d 24 [1978]).
Finally, while the issue preclusion doctrine of collateral estoppel could arguably be invoked, it may not be applied to give binding effect to the Amended Order in this proceeding. As is well settled, in order for a party to successfully rely upon this doctrine, it must be demonstrated that the party against whom it is invoked had a fair opportunity to litigate the issue involved (Kaufman v Eli Lilly & Co., 65 NY2d 449, 455 [1985]). Although it is evident that J.H.L. had a full opportunity to litigate the issues resulting in the 1996 Order, it is undisputed that the Amended Order was obtained as a result of an ex parte application. Thus, J.H.L. had no opportunity to contest the issue of whether the powers granted to F.L. should be increased or modified in such a manner as to permit him to waive her right to seek a Rivers hearing. Consequently, while an argument in favor of issue preclusion has not been specifically posited by the Hospital, to the extent that such an argument is encompassed by the position taken in its memorandum of law, it is rejected by the court (cf., id.).[7]
*154 CONCLUSION
Upon the analysis set forth above, this court concludes that a finding of incapacity pursuant to Mental Hygiene Law article 81 does not grant a guardian the power to waive a Rivers hearing over the objection of the incapacitated individual. Based upon that conclusion and the absence of any legal requirement that this court give effect to the 1996 Order and the Amended Order so as to deprive J.H.L. of a right to a hearing which is constitutionally protected, the court directs that a hearing be conducted to determine whether the Hospital may administer medication to J.H.L. over her objection.

. The court has used the initials of the patient and her guardian to preserve the confidentiality of their identities in this proceeding.

. In rendering a determination on the issues involved in this proceeding, the court has considered the brief submitted by the Hospital, in its behalf and that of J.H.L.’s guardian, and by Mental Hygiene Legal Services, in behalf of J.H.L.

. The court evaluator recommended the appointment of a guardian based, in part, on her conclusion that J.H.L. “ ‘will suffer great harm because of her impaired functional limitations due to an ongoing battle with schizophrenia and her inability to comprehend that she cannot manage her daily needs’ ” (petitioner’s brief, at 2).

. As set forth in the Court’s footnote 1, psychotropic drugs of the kind the Hospital seeks to administer to J.H.L. over her objection have numerous side effects, of which “[t]he most potentially devastating * * * is tardive dyskinesia, an irreversible neurological disorder characterized by involuntary, rhythmic and grotesque movements of the face, mouth, tongue, jaw and extremities.” (Rivers v Katz, supra, at 490, n 1.)

. In the even more serious context of the right to refuse life-prolonging procedures, one court has interpreted Rivers (supra) to mean that “incompetent patients do not lose their constitutional right to privacy merely because of their incompetency” (Matter of Weinstein, 136 Misc 2d 931, 934 [Sup Ct, NY County 1987]).

. Although not controlling in this case, the court notes that in Superintendent of Belchertown State School v Saikewicz (373 Mass 728, 745, 370 NE2d 417, 427 [1977]), the Supreme Judicial Court of Massachusetts recognized that the right to refuse medical treatment “must extend to the case of an incompetent, as well as a competent, patient because the value of human dignity extends to both.” Consequently, in Massachusetts, when an incompetent person refuses antipsychotic drugs, he is entitled to a judicial determination of “substituted judgment”, i.e., a determination of what course the incompetent individual would have chosen if he was competent (Matter of Roe, 383 Mass 415, 434, 421 NE2d 40, 51 [1981]). While the nature of the hearing granted in Massachusetts differs from a Rivers hearing, the view taken by the courts in Massachusetts further supports this court’s conclusion that J.H.L. did not forfeit her constitutional right to challenge forcible treatment by virtue of the incapacity finding rendered in the article 81 proceeding.

. The Court of Appeals has recognized that in general, when addressing applications for court-ordered medical treatment, Trial Judges should not sign ex parte orders “without giving the patient * * * an opportunity to be heard”, since such requests “affect important rights of the patients” (see, Matter of Fosmire v Nicoleau, 75 NY2d 218, 224 [1990] [blood transfusion order should not have been rendered ex parte]). Thus, while not intended as a criticism of the actions of Justice Rossetti, it is certainly arguable that the *154 letter sent by F.L. should not have been considered on its merits without notice first being given to J.H.L.